# SCHERK *v.* ALBERTO-CULVER CO.

No. 73-781.   Argued April 29, 1974—Decided June 17, 1974

STEWART, J., delivered the opinion of the Court, in which BURGER, C. J., and BLACKMUN, POWELL, and REHNQUIST, JJ., joined. DOUGLAS, J., filed a dissenting opinion, in which BRENNAN, WHITE, and MARSHALL, JJ., joined, *post*, p. 521.

*Robert F. Hanley* argued the cause for petitioner. With him on the briefs was *Lynne E. McNown.*

*Francis J. Higgins* argued the cause for respondent. With him on the brief was *A. Charles Lawrence.*

*Gerald Aksen* argued the cause for the American Arbitration Assn. as *amicus curiae* urging reversal. With him on the brief were *Whitney North Seymour, Sol Neil Corbin, Rita E. Hauser, Howard M. Holtzmann, Andreas F. Lowenfeld, John R. Stevenson,* and *Rosemary S. Page.*

MR. JUSTICE STEWART delivered the opinion of the Court.

Alberto-Culver Co., the respondent, is an American company incorporated in Delaware with its principal office in Illinois. It manufactures and distributes toiletries and hair products in this country and abroad. During the 1960's Alberto-Culver decided to expand its overseas operations, and as part of this program it approached the petitioner Fritz Scherk, a German citizen residing at the time of trial in Switzerland. Scherk was the owner of three interrelated business entities, organized under the laws of Germany and Liechtenstein, that were engaged in the manufacture of toiletries and the licensing of trademarks for such toiletries. An initial contact with Scherk was made by a representative of Alberto-Culver in Germany in June 1967, and negotiations followed at further meetings in both Europe and the United States during 1967 and 1968. In February 1969 a contract was signed in Vienna, Austria, which provided for the transfer of the ownership of Scherk's enterprises to Alberto-Culver, along with all rights held by these enterprises to trademarks in cosmetic goods. The contract contained a number of express warranties whereby Scherk guaranteed the sole and unencumbered ownership of these trademarks. In addition, the contract contained an arbitration clause providing that "any controversy or claim [that] shall arise out of this agreement or the breach thereof" would be referred to arbitration before the International Chamber of Commerce in Paris, France, and that "[t]he laws of the State of Illinois, U. S. A. shall apply to and govern this agreement, its interpretation and performance." [1]

---

[1] The arbitration clause relating to the transfer of one of Scherk's business entities, similar to the clauses covering the other two, reads in its entirety as follows:

"The parties agree that if any controversy or claim shall arise out

The closing of the transaction took place in Geneva, Switzerland, in June 1969. Nearly one year later Alberto-Culver allegedly discovered that the trademark rights purchased under the contract were subject to substantial encumbrances that threatened to give others superior rights to the trademarks and to restrict or preclude Alberto-Culver's use of them. Alberto-Culver thereupon tendered back to Scherk the property that had been transferred to it and offered to rescind the contract. Upon Scherk's refusal, Alberto-Culver commenced this action for damages and other relief in a Federal District Court in Illinois, contending that Scherk's fraudulent representations concerning the status of the trademark rights constituted violations of § 10 (b) of the Securities Exchange Act of 1934, 48 Stat. 891, 15 U. S. C. § 78j (b), and Rule 10b–5 promulgated thereunder, 17 CFR § 240.-10b–5.

In response, Scherk filed a motion to dismiss the action for want of personal and subject-matter jurisdiction as well as on the basis of *forum non conveniens,* or, alternatively, to stay the action pending arbitration in Paris pursuant to the agreement of the parties. Alberto-

of this agreement or the breach thereof and either party shall request that the matter shall be settled by arbitration, the matter shall be settled exclusively by arbitration in accordance with the rules then obtaining of the International Chamber of Commerce, Paris, France, by a single arbitrator, if the parties shall agree upon one, or by one arbitrator appointed by each party and a third arbitrator appointed by the other arbitrators. In case of any failure of a party to make an appointment referred to above within four weeks after notice of the controversy, such appointment shall be made by said Chamber. All arbitration proceedings shall be held in Paris, France, and each party agrees to comply in all respects with any award made in any such proceeding and to the entry of a judgment in any jurisdiction upon any award rendered in such proceeding. The laws of the State of Illinois, U. S. A. shall apply to and govern this agreement, its interpretation and performance."

Culver, in turn, opposed this motion and sought a preliminary injunction restraining the prosecution of arbitration proceedings.[2]   On December 2, 1971, the District Court denied Scherk's motion to dismiss, and, on January 14, 1972, it granted a preliminary order enjoining Scherk from proceeding with arbitration.   In taking these actions the court relied entirely on this Court's decision in *Wilko* v. *Swan,* 346 U. S. 427, which held that an agreement to arbitrate could not preclude a buyer of a security from seeking a judicial remedy under the Securities Act of 1933, in view of the language of § 14 of that Act, barring "[a]ny condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision of this subchapter . . . ."   48 Stat. 84, 15 U. S. C. § 77n.[3]   The Court of Appeals for the Seventh Circuit, with one judge dissenting, affirmed, upon what it considered the controlling authority of the *Wilko* decision.   484 F. 2d 611.   Because of the importance of the question presented we granted Scherk's petition for a writ of certiorari.   414 U. S. 1156.

## I

The United States Arbitration Act, now 9 U. S. C. § 1 *et seq.,* reversing centuries of judicial hostility to arbitration agreements,[4] was designed to allow parties to avoid

---

[2] Scherk had taken steps to initiate arbitration in Paris in early 1971.   He did not, however, file a formal request for arbitration with the International Chamber of Commerce until November 9, 1971, almost five months after the filing of Alberto-Culver's complaint in the Illinois federal court.

[3] The memorandum opinion of the District Court is unreported.

[4] English courts traditionally considered irrevocable arbitration agreements as "ousting" the courts of jurisdiction, and refused to enforce such agreements for this reason.   This view was adopted by American courts as part of the common law up to the time of the adoption of the Arbitration Act.   See H. R. Rep. No. 96, 68th Cong.,

"the costliness and delays of litigation," and to place arbitration agreements "upon the same footing as other contracts . . . ." H. R. Rep. No. 96, 68th Cong., 1st Sess., 1, 2 (1924); see also S. Rep. No. 536, 68th Cong., 1st Sess. (1924). Accordingly, the Act provides that an arbitration agreement such as is here involved "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U. S. C. § 2.[5] The Act also provides in § 3 for a stay of proceedings in a case where a court is satisfied that the issue before it is arbitrable under the agreement, and § 4 of the Act directs a federal court to order parties to proceed to arbitration if there has been a "failure, neglect, or refusal" of any party to honor an agreement to arbitrate.

In *Wilko* v. *Swan, supra,* this Court acknowledged that the Act reflects a legislative recognition of the "desirability of arbitration as an alternative to the complications of litigation," 346 U. S., at 431, but nonetheless declined to apply the Act's provisions. That case involved an agreement between Anthony Wilko and Hayden, Stone & Co., a large brokerage firm, under which Wilko agreed to purchase on margin a number of shares of a corporation's common stock. Wilko alleged that his purchase of the stock was induced by false represen-

---

1st Sess., 1, 2 (1924); Sturges & Murphy, Some Confusing Matters Relating to Arbitration under the United States Arbitration Act, 17 Law & Contemp. Prob. 580.

[5] Section 2 of the Arbitration Act renders "valid, irrevocable, and enforceable" written arbitration provisions "in any maritime transaction or a contract evidencing a transaction involving commerce . . . ," as those terms are defined in § 1. In *Bernhardt* v. *Polygraphic Co.,* 350 U. S. 198, this Court held that the stay provisions of § 3 apply only to the two kinds of contracts specified in §§ 1 and 2. Since the transaction in this case constituted "commerce . . . with foreign nations," 9 U. S. C. § 1, the Act clearly covers this agreement.

tations on the part of the defendant concerning the value of the shares, and he brought suit for damages under § 12 (2) of the Securities Act of 1933, 15 U. S. C. § 77*l*. The defendant responded that Wilko had agreed to submit all controversies arising out of the purchase to arbitration, and that this agreement, contained in a written margin contract between the parties, should be given full effect under the Arbitration Act.

The Court found that "[t]wo policies, not easily reconcilable, are involved in this case." 346 U. S., at 438. On the one hand, the Arbitration Act stressed "the need for avoiding the delay and expense of litigation," *id.,* at 431, and directed that such agreements be "valid, irrevocable, and enforceable" in federal courts. On the other hand, the Securities Act of 1933 was "[d]esigned to protect investors" and to require "issuers, underwriters, and dealers to make full and fair disclosure of the character of securities sold in interstate and foreign commerce and to prevent fraud in their sale," by creating "a special right to recover for misrepresentation . . . ." 346 U. S., at 431 (footnote omitted). In particular, the Court noted that § 14 of the Securities Act, 15 U. S. C. § 77n, provides:

> "Any condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision of this subchapter or of the rules and regulations of the Commission shall be void."

The Court ruled that an agreement to arbitrate "is a 'stipulation,' and [that] the right to select the judicial forum is the kind of 'provision' that cannot be waived under § 14 of the Securities Act." [6] 346 U. S., at 434–435.

---

[6] The arbitration agreement involved in *Wilko* was contained in a standard form margin contract. But see the dissenting opinion of Mr. Justice Frankfurter, 346 U. S. 427, 439, 440, concluding that the record did not show that "the plaintiff [Wilko] in opening an ac-

Thus, Wilko's advance agreement to arbitrate any disputes subsequently arising out of his contract to purchase the securities was unenforceable under the terms of § 14 of the Securities Act of 1933.

Alberto-Culver, relying on this precedent, contends that the District Court and Court of Appeals were correct in holding that its agreement to arbitrate disputes arising under the contract with Scherk is similarly unenforceable in view of its contentions that Scherk's conduct constituted violations of the Securities Exchange Act of 1934 and rules promulgated thereunder. For the reasons that follow, we reject this contention and hold that the provisions of the Arbitration Act cannot be ignored in this case.

At the outset, a colorable argument could be made that even the semantic reasoning of the *Wilko* opinion does not control the case before us. *Wilko* concerned a suit brought under § 12 (2) of the Securities Act of 1933, which provides a defrauded purchaser with the "special right" of a private remedy for civil liability, 346 U. S., at 431. There is no statutory counterpart of § 12 (2) in the Securities Exchange Act of 1934, and neither § 10 (b) of that Act nor Rule 10b–5 speaks of a private remedy to redress violations of the kind alleged here. While federal case law has established that § 10 (b) and Rule 10b–5 create an implied private cause of action, see

count had no choice but to accept the arbitration stipulation . . . ." The petitioner here would limit the decision in *Wilko* to situations where the parties exhibit a disparity of bargaining power, and contends that, since the negotiations leading to the present contract took place over a number of years and involved the participation on both sides of knowledgeable and sophisticated business and legal experts, the *Wilko* decision should not apply. See also the dissenting opinion of Judge Stevens of the Court of Appeals in this case, 484 F. 2d 611, 615. Because of our disposition of this case on other grounds, we need not consider this contention.

6 L. Loss, Securities Regulation 3869–3873 (1969) and cases cited therein; cf. *J. I. Case Co.* v. *Borak,* 377 U. S. 426, the Act itself does not establish the "special right" that the Court in *Wilko* found significant. Furthermore, while both the Securities Act of 1933 and the Securities Exchange Act of 1934 contain sections barring waiver of compliance with any "provision" of the respective Acts,[7] certain of the "provisions" of the 1933 Act that the Court held could not be waived by Wilko's agreement to arbitrate find no counterpart in the 1934 Act. In particular, the Court in *Wilko* noted that the jurisdictional provision of the 1933 Act, 15 U. S. C. § 77v, allowed a plaintiff to bring suit "in any court of competent jurisdiction—federal or state—and removal from a state court is prohibited." 346 U. S., at 431. The analogous provision of the 1934 Act, by contrast, provides for suit only in the federal district courts that have "exclusive jurisdiction," 15 U. S. C. § 78aa, thus significantly restricting the plaintiff's choice of forum.[8]

---

[7] Section 14 of the Securities Act of 1933, 15 U. S. C. § 77n, provides as follows:

"Any condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision of this subchapter or of the rules and regulations of the Commission shall be void."

Section 29 (a) of the Securities Exchange Act of 1934, 15 U. S. C. § 78cc (a), provides:

"Any condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder, or of any rule of an exchange required thereby shall be void."

While the two sections are not identical, the variations in their wording seem irrelevant to the issue presented in this case.

[8] We do not reach, or imply any opinion as to, the question whether the acquisition of Scherk's businesses was a security transaction within the meaning of § 10 (b) of the Securities Exchange Act of 1934 and Rule 10b–5. Although this important question

Accepting the premise, however, that the operative portions of the language of the 1933 Act relied upon in *Wilko* are contained in the Securities Exchange Act of 1934, the respondent's reliance on *Wilko* in this case ignores the significant and, we find, crucial differences between the agreement involved in *Wilko* and the one signed by the parties here. Alberto-Culver's contract to purchase the business entities belonging to Scherk was a truly international agreement. Alberto-Culver is an American corporation with its principal place of business and the vast bulk of its activity in this country, while Scherk is a citizen of Germany whose companies were organized under the laws of Germany and Liechtenstein. The negotiations leading to the signing of the contract in Austria and to the closing in Switzerland took place in the United States, England, and Germany, and involved consultations with legal and trademark experts from each of those countries and from Liechtenstein. Finally, and most significantly, the subject matter of the contract concerned the sale of business enterprises organized under the laws of and primarily situated in European countries, whose activities were largely, if not entirely, directed to European markets.

Such a contract involves considerations and policies significantly different from those found controlling in *Wilko*. In *Wilko,* quite apart from the arbitration provision, there was no question but that the laws of the United States generally, and the federal securities laws in particular, would govern disputes arising out of the stock-purchase agreement. The parties, the negotiations, and the subject matter of the contract were all

was considered by the District Court and the Court of Appeals, and although the dissenting opinion, *post,* p. 521, seems to consider it controlling, the petitioner did not assign the adverse ruling on the question as error and it was not briefed or argued in this Court.

situated in this country, and no credible claim could have been entertained that any international conflict-of-laws problems would arise. In this case, by contrast, in the absence of the arbitration provision considerable uncertainty existed at the time of the agreement, and still exists, concerning the law applicable to the resolution of disputes arising out of the contract.[9]

Such uncertainty will almost inevitably exist with respect to any contract touching two or more countries, each with its own substantive laws and conflict-of-laws rules. A contractual provision specifying in advance the forum in which disputes shall be litigated and the law to be applied is, therefore, an almost indispensable precondition to achievement of the orderliness and predictability essential to any international business transaction. Furthermore, such a provision obviates the danger that a dispute under the agreement might be submitted to a forum hostile to the interests of one of the parties or unfamiliar with the problem area involved.[10]

A parochial refusal by the courts of one country to enforce an international arbitration agreement would not only frustrate these purposes, but would invite

---

[9] Together with his motion for a stay pending arbitration, Scherk moved that the complaint be dismissed because the federal securities laws do not apply to this international transaction, cf. *Leasco Data Processing Equipment Corp.* v. *Maxwell,* 468 F. 2d 1326 (CA2 1972). Since only the order granting the injunction was appealed, this contention was not considered by the Court of Appeals and is not before this Court.

[10] See Quigley, Accession by the United States to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 70 Yale L. J. 1049, 1051 (1961). For example, while the arbitration agreement involved here provided that the controversies arising out of the agreement be resolved under "[t]he laws of the State of Illinois," *supra,* n. 1, a determination of the existence and extent of fraud concerning the trademarks would necessarily involve an understanding of foreign law on that subject.

unseemly and mutually destructive jockeying by the parties to secure tactical litigation advantages. In the present case, for example, it is not inconceivable that if Scherk had anticipated that Alberto-Culver would be able in this country to enjoin resort to arbitration he might have sought an order in France or some other country enjoining Alberto-Culver from proceeding with its litigation in the United States. Whatever recognition the courts of this country might ultimately have granted to the order of the foreign court, the dicey atmosphere of such a legal no-man's-land would surely damage the fabric of international commerce and trade, and imperil the willingness and ability of businessmen to enter into international commercial agreements.[11]

The exception to the clear provisions of the Arbitration Act carved out by *Wilko* is simply inapposite to a case such as the one before us. In *Wilko* the Court reasoned

[11] The dissenting opinion argues that our conclusion that *Wilko* is inapplicable to the situation presented in this case will vitiate the force of that decision because parties to transactions with many more direct contacts with this country than in the present case will nonetheless be able to invoke the "talisman" of having an "international contract." *Post*, at 529. Concededly, situations may arise where the contacts with foreign countries are so insignificant or attenuated that the holding in *Wilko* would meaningfully apply. Judicial response to such situations can and should await future litigation in concrete cases. This case, however, provides no basis for a judgment that only United States laws and United States courts should determine this controversy in the face of a solemn agreement between the parties that such controversies be resolved elsewhere. The only contact between the United States and the transaction involved here is the fact that Alberto-Culver is an American corporation and the occurrence of some—but by no means the greater part—of the pre-contract negotiations in this country. To determine that "American standards of fairness," *post*, at 528, must nonetheless govern the controversy demeans the standards of justice elsewhere in the world, and unnecessarily exalts the primacy of United States law over the laws of other countries.

that "[w]hen the security buyer, prior to any violation of the Securities Act, waives his right to sue in courts, he gives up more than would a participant in other business transactions. The security buyer has a wider choice of courts and venue. He thus surrenders one of the advantages the Act gives him . . . ." 346 U. S., at 435. In the context of an international contract, however, these advantages become chimerical since, as indicated above, an opposing party may by speedy resort to a foreign court block or hinder access to the American court of the purchaser's choice.[12]

Two Terms ago in *The Bremen* v. *Zapata Off-Shore Co.,* 407 U. S. 1, we rejected the doctrine that a forum-selection clause of a contract, although voluntarily adopted by the parties, will not be respected in a suit brought in the United States " 'unless the selected state would provide a more convenient forum than the state in which suit is brought.' " *Id.,* at 7. Rather, we concluded that a "forum clause should control absent a strong showing that it should be set aside." *Id.,* at 15. We noted that "much uncertainty and possibly great inconvenience to both parties could arise if a suit could be maintained in any jurisdiction in which an accident might occur or if jurisdiction were left to any place [where personal or *in rem* jurisdiction might be established]. The elimination of all such uncertainties by agreeing in advance on a forum acceptable to both parties is an indispensable element in international trade, commerce, and contracting." *Id.,* at 13–14.

---

[12] The dissenting opinion raises the specter that our holding today will leave American investors at the mercy of multinational corporations with "vast operations around the world . . . ." *Post,* at 533. Our decision, of course, has no bearing on the scope of the substantive provisions of the federal securities laws for the simple reason that the question is not presented in this case. See n. 8, *supra.*

An agreement to arbitrate before a specified tribunal is, in effect, a specialized kind of forum-selection clause that posits not only the situs of suit but also the procedure to be used in resolving the dispute.[13]  The invalidation of such an agreement in the case before us would not only allow the respondent to repudiate its solemn promise but would, as well, reflect a "parochial concept that all disputes must be resolved under our laws and in our courts. . . . We cannot have trade and commerce in world markets and international waters exclusively on our terms, governed by our laws, and resolved in our courts."  *Id.*, at 9.[14]

For all these reasons we hold that the agreement of the parties in this case to arbitrate any dispute arising out of their international commercial transaction is to be

---

[13] Under some circumstances, the designation of arbitration in a certain place might also be viewed as implicitly selecting the law of that place to apply to that transaction.  In this case, however, "[t]he laws of the State of Illinois" were explicitly made applicable by the arbitration agreement.  See n. 1, *supra.*

[14] In *The Bremen* we noted that forum-selection clauses "should be given full effect" when "a freely negotiated private international agreement [is] unaffected by fraud . . . ."  407 U. S., at 13, 12.  This qualification does not mean that any time a dispute arising out of a transaction is based upon an allegation of fraud, as in this case, the clause is unenforceable.  Rather, it means that an arbitration or forum-selection clause in a contract is not enforceable if the *inclusion of that clause in the contract* was the product of fraud or coercion.  Cf. *Prima Paint Corp.* v. *Flood & Conklin Mfg. Co.*, 388 U. S. 395.

Although we do not decide the question, presumably the type of fraud alleged here could be raised, under Art. V of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, see n. 15, *infra*, in challenging the enforcement of whatever arbitral award is produced through arbitration.  Article V (2) (*b*) of the Convention provides that a country may refuse recognition and enforcement of an award if "recognition or enforcement of the award would be contrary to the public policy of that country."

respected and enforced by the federal courts in accord with the explicit provisions of the Arbitration Act.[15]

Accordingly, the judgment of the Court of Appeals is

[15] Our conclusion today is confirmed by international developments and domestic legislation in the area of commercial arbitration subsequent to the *Wilko* decision. On June 10, 1958, a special conference of the United Nations Economic and Social Council adopted the Convention on the Recognition and Enforcement of Foreign Arbitral Awards. In 1970 the United States acceded to the treaty, [1970] 3 U. S. T. 2517, T. I. A. S. No. 6997, and Congress passed Chapter 2 of the United States Arbitration Act, 9 U. S. C. § 201 *et seq.*, in order to implement the Convention. Section 1 of the new chapter, 9 U. S. C. § 201, provides unequivocally that the Convention "shall be enforced in United States courts in accordance with this chapter."

The goal of the Convention, and the principal purpose underlying American adoption and implementation of it, was to encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries. See Convention on the Recognition and Enforcement of Foreign Arbitral Awards, S. Exec. Doc. E, 90th Cong., 2d Sess. (1968); Quigley, Accession by the United States to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 70 Yale L. J. 1049 (1961). Article II (1) of the Convention provides:

"Each Contracting State shall recognize an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration."

In their discussion of this Article, the delegates to the Convention voiced frequent concern that courts of signatory countries in which an agreement to arbitrate is sought to be enforced should not be permitted to decline enforcement of such agreements on the basis of parochial views of their desirability or in a manner that would diminish the mutually binding nature of the agreements. See G. Haight, Convention on the Recognition and Enforcement of For-

reversed and the case is remanded to that court with directions to remand to the District Court for further proceedings consistent with this opinion.

*It is so ordered.*

Mr. Justice Douglas, with whom Mr. Justice Brennan, Mr. Justice White, and Mr. Justice Marshall concur, dissenting.

Respondent (Alberto-Culver) is a publicly held corporation whose stock is traded on the New York Stock Exchange and is a Delaware corporation with its principal place of business in Illinois. Petitioner (Scherk) owned a business in Germany, Firma Ludwig Scherk, dealing with cosmetics and toiletries. Scherk owned various trademarks and all outstanding securities of a Liechtenstein corporation (SEV) and of a German corporation, Lodeva. Scherk also owned various trademarks which were licensed to manufacturers and distributors in Europe and in this country. SEV collected the royalties on those licenses.

Alberto-Culver undertook to purchase from Scherk the entire establishment—the trademarks and the stock of the two corporations; and later, alleging it had been defrauded, brought this suit in the United States District Court in Illinois to rescind the agreement and to obtain damages.

eign Arbitral Awards: Summary Analysis of Record of United Nations Conference, May/June 1958, pp. 24–28 (1958).

Without reaching the issue of whether the Convention, apart from the considerations expressed in this opinion, would require of its own force that the agreement to arbitrate be enforced in the present case, we think that this country's adoption and ratification of the Convention and the passage of Chapter 2 of the United States Arbitration Act provide strongly persuasive evidence of congressional policy consistent with the decision we reach today.

The only defense material at this stage of the proceeding is a provision of the contract providing that if any controversy or claim arises under the agreement the parties agree it will be settled "exclusively" by arbitration under the rules of the International Chamber of Commerce, Paris, France.

The basic dispute between the parties concerned allegations that the trademarks which were basic assets in the transaction were encumbered and that their purchase was induced through serious instances of fraudulent representations and omissions by Scherk and his agents within the jurisdiction of the United States. If a question of trademarks were the only one involved, the principle of *The Bremen* v. *Zapata Off-Shore Co.*, 407 U. S. 1, would be controlling.

We have here, however, questions under the Securities Exchange Act of 1934, which in § 3 (a) (10) defines "security" as including any "note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement . . . ." 15 U. S. C. § 78c (a) (10). We held in *Tcherepnin* v. *Knight,* 389 U. S. 332, as respects § 3 (a) (10):

"[R]emedial legislation should be construed broadly to effectuate its purposes. The Securities Exchange Act quite clearly falls into the category of remedial legislation. One of its central purposes is to protect investors through the requirement of full disclosure by issuers of securities, and the definition of security in § 3 (a) (10) necessarily determines the classes of investments and investors which will receive the Act's protections. Finally, we are reminded that, in searching for the meaning and scope of the word 'security' in the Act, form should be disregarded for substance and the emphasis should

be on economic reality." *Id.,* at 336. (Footnote omitted.)

Section 10 (b) of the 1934 Act makes it unlawful for any person by use of agencies of interstate commerce or the mails "[t]o use or employ, in connection with the purchase or sale of any security," whether or not registered on a national securities exchange, "any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U. S. C. § 78j (b).

Alberto-Culver, as noted, is not a private person but a corporation with publicly held stock listed on the New York Stock Exchange. If it is to be believed, if in other words the allegations made are proved, the American company has been defrauded by the issuance of "securities" (promissory notes) for assets which are worthless or of a much lower value than represented. Rule 10b-5 of the Securities and Exchange Commission states:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

"(a) To employ any device, scheme, or artifice to defraud,

"(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

"(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

"in connection with the purchase or sale of any security." 17 CFR § 240.10b-5.

Section 29 (a) of the Act provides:

"Any condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder, or of any rule of an exchange required thereby shall be void." 15 U. S. C. § 78cc (a).

And § 29 (b) adds that "[e]very contract" made in violation of the Act "shall be void." [1] No exception is made for contracts which have an international character.

The Securities Act of 1933, 48 Stat. 84, 15 U. S .C. § 77n, has a like provision in its § 14:

"Any condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision of this subchapter or of the rules and regulations of the Commission shall be void."

In *Wilko* v. *Swan,* 346 U. S. 427, a customer brought suit against a brokerage house alleging fraud in the sale of stock. A motion was made to stay the trial until arbitration occurred under the United States Arbitration Act, 9 U. S. C. § 3, as provided in the customer's contract. The

---

[1] Section 29 (b) reads: "Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract (including any contract for listing a security on an exchange) heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract, and (2) as regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision, rule, or regulation . . . ." 15 U. S. C. § 78cc (b).

Court held that an agreement for arbitration was a "stipulation" within the meaning of § 14 which sought to "waive" compliance with the Securities Act. We accordingly held that the courts, not the arbitration tribunals, had jurisdiction over suits under that Act. The arbitration agency, we held, was bound by other standards which were not necessarily consistent with the 1933 Act. We said:

> "As the protective provisions of the Securities Act require the exercise of judicial direction to fairly assure their effectiveness, it seems to us that Congress must have intended § 14 . . . to apply to waiver of judicial trial and review." 346 U. S., at 437.

*Wilko* was held by the Court of Appeals to control this case—and properly so.

The Court does not consider the question whether a "security" is involved in this case, saying it was not raised by petitioner. A respondent, however, has the right to urge any argument to support the judgment in his favor (save possibly questions of venue, see *Peoria R. Co.* v. *United States,* 263 U. S. 528, 536; *United States* v. *American Railway Express Co.,* 265 U. S. 425, 435–436, and n. 11), even those not passed upon by the court below and also contentions rejected below. *Langnes* v. *Green,* 282 U. S. 531, 535–539; *Walling* v. *General Industries Co.,* 330 U. S. 545, 547 n. 5. The Court of Appeals held that "securities" within the meaning of the 1934 Act were involved here, 484 F. 2d 611, 615. The brief of the respondent is based on the premise that "securities" are involved here; and petitioner has not questioned that ruling of the Court of Appeals.

It could perhaps be argued that *Wilko* does not govern because it involved a little customer pitted against a big brokerage house, while we deal here with sophisticated buyers and sellers: Scherk, a powerful German operator,

and Alberto-Culver, an American business surrounded and protected by lawyers and experts. But that would miss the point of the problem. The Act does not speak in terms of "sophisticated" as opposed to "unsophisticated" people dealing in securities. The rules when the giants play are the same as when the pygmies enter the market.

If there are victims here, they are not Alberto-Culver the corporation, but the thousands of investors who are the security holders in Alberto-Culver. If there is fraud and the promissory notes are excessive, the impact is on the equity in Alberto-Culver.

Moreover, the securities market these days is not made up of a host of small people scrambling to get in and out of stocks or other securities. The markets are overshadowed by huge institutional traders.[2] The so-called "off-shore funds," of which Scherk is a member, present perplexing problems under both the 1933 and 1934 Acts.[3] The tendency of American investors to invest indirectly as through mutual funds[4] may change the character of the regulation but not its need.

There has been much support for arbitration of disputes; and it may be the superior way of settling some disagreements. If A and B were quarreling over a trademark and there was an arbitration clause in the contract, the policy of Congress in implementing the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, as it did in 9 U. S. C. § 201 *et seq.*, would prevail. But the Act does not substitute an arbiter for the settlement of disputes under

---

[2] See Institutional Investor Study Report of the SEC, H. R. Doc. No. 92-64 (1971), particularly Vol. 4.

[3] *Id.*, Vol. 1, p. XVI; Vol. 3, p. 879 *et seq.*

[4] *Id.*, Vol. 1, p. XIX; Vol. 2, p. 215 *et seq.*

the 1933 and 1934 Acts. Art. II (3) of the Convention says:

> "The court of a Contracting State, when seized of an action in a matter in respect of which the parties have made an agreement within the meaning of this article, shall, at the request of one of the parties, refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed." [5]  [1970] 3 U. S. T. 2517, 2519, T. I. A. S. No. 6997.

But § 29 (a) of the 1934 Act makes agreements to arbitrate liabilities under § 10 of the Act "void" and "inoperative." Congress has specified a precise way whereby big and small investors will be protected and the rules under which the Alberto-Culvers of this Nation shall operate. They or their lawyers cannot waive those statutory conditions, for our corporate giants are not principalities of power but guardians of a host of wards unable to care for themselves. It is these wards that the 1934 Act tries to protect.[6] Not a word in the Convention gov-

---

[5] The Convention also permits that arbitral awards not be recognized and enforced when a court in the country where enforcement is sought finds that "[t]he recognition or enforcement of the award would be contrary to the public policy of that country." Art. V (2)(b); [1970] 3 U. S. T. 2517, 2520, T. I. A. S. No. 6997. It also provides that recognition of an award may be refused when the arbitration agreement "is not valid under the law to which the parties have subjected it," in this case the laws of Illinois. Art. V (1)(a). See n. 10, *infra*.

[6] Requirements promulgated under the 1934 Act require disclosure to security holders of corporate action which may affect them. Extensive annual reports must be filed with the SEC including, *inter alia*, financial figures, changes in the conduct of business, the acquisition or disposition of assets, increases or decreases in outstanding securities, and even the importance to the business of trademarks held. See 17 CFR §§ 240.13a–1, 249.310; 3 CCH Fed. Sec. L. Rep. ¶ 31,101 *et seq.* (Form 10–K). The Commission has pro-

erning awards adopts the standards which Congress has passed to protect the investors under the 1934 Act. It is peculiarly appropriate that we adhere to *Wilko*—more so even than when *Wilko* was decided. Huge foreign investments are being made in our companies. It is important that American standards of fairness in security dealings govern the destinies of American investors until Congress changes these standards.

The Court finds it unnecessary to consider Scherk's argument that this case is distinguishable from *Wilko* in that *Wilko* involved parties of unequal bargaining strength. *Ante,* at 512–513, n. 6. Instead, the Court rests its conclusion on the fact that this was an "international" agreement, with an American corporation investing in the stock and property of foreign businesses, and speaks favorably of the certainty which inheres when parties

posed that corporations furnish a copy of annual reports filed with it to any security holder who is solicited for a proxy and requests the report. 39 Fed. Reg. 3836. Current reports must be filed with the SEC by an issuer of securities when substantial events occur, as when the rights evidenced by any class of securities are materially altered by the issuance of another class of securities or when an issuer has acquired a significant amount of assets other than in the ordinary course of business. See 17 CFR §§ 240.13a–11, 249.308; 3 CCH Fed. Sec. L. Rep. ¶ 31,001 *et seq.* (Form 8–K).

The Commission, recognizing that the Form 10–K reports filed annually with it might be excessively abstruse for security holders, see 39 Fed. Reg. 3835, has proposed that the annual reports distributed to security holders in connection with annual meetings and solicitation of proxies provide substantially greater amounts of meaningful information than required presently. These annual reports would include a description of the business of the issuer, a summary of operations, explanation of changes in revenues and expenses, information on the liquidity position and the working capital requirements of the issuer, and identification of management and performance on the market of the issuer's securities. See *id.,* at 3834–3838.

specify an arbitral forum for resolution of differences in "any contract touching two or more countries."

This invocation of the "international contract" talisman might be applied to a situation where, for example, an interest in a foreign company or mutual fund was sold to an utterly unsophisticated American citizen, with material fraudulent misrepresentations made in this country. The arbitration clause could appear in the fine print of a form contract, and still be sufficient to preclude recourse to our courts, forcing the defrauded citizen to arbitration in Paris to vindicate his rights.[7]

It has been recognized that the 1934 Act, including the protections of Rule 10b–5, applies when foreign defendants have defrauded American investors, particularly when, as alleged here,[8] they have profited by virtue

---

[7] The Court concedes, *ante,* at 517 n. 11, that there may be situations where foreign contacts were "so insignificant or attenuated" that *Wilko* would apply and an American court would not enforce an arbitration agreement in an international contract. The recognition that "international" contracts may in fact involve significant direct contacts with this country is realistic and salutary. But the Court by its concession undermines somewhat its reliance on its admonition—itself supported only by speculation—that "[a] contractual provision specifying in advance the forum in which disputes shall be litigated . . . is . . . an almost indispensable precondition to achievement of the orderliness and predictability essential to any international business transaction." Uncertainty and a "dicey atmosphere," supposedly destructive of international contracts, may persist for many contracts. The parties to an international contract may not in fact be bound by a "solemn agreement" to arbitrate, for an American court could find, at a much later date, sufficient contacts with this country to require the application of *Wilko.*

[8] The District Court for the Northern District of Illinois noted allegations that Scherk had failed to state a material fact, the omission of which would have been misleading, see 17 CFR § 240.10b–5 (b), during crucial negotiations in Melrose Park, Illinois, and that communications between Alberto-Culver and Scherk's attorney concerning the validity and value of the trademarks occurred within the

of proscribed conduct within our boundaries. This is true even when the defendant is organized under the laws of a foreign country, is conducting much of its activity outside the United States, and is therefore governed largely by foreign law.[9] The language of § 29 of the 1934 Act does not immunize such international transactions, and the United Nations Convention provides that a forum court in which a suit is brought need not enforce an agreement to arbitrate which is "void" and "inoperative" as contrary to its public policy.[10] When a

territorial jurisdiction of the United States. Finally, the District Court noted that the full economic impact of the alleged fraud occurred within the United States.

[9] See, e. g., Leasco Data Processing Equipment Corp. v. Maxwell, 468 F. 2d 1326, 1334–1339 (CA2 1972); Travis v. Anthes Imperial Ltd., 473 F. 2d 515, 523–528 (CA8 1973); SEC v. United Financial Group, Inc., 474 F. 2d 354 (CA9 1973); Schoenbaum v. Firstbrook, 405 F. 2d 200 (CA2 1968); Roth v. Fund of Funds, 279 F. Supp. 935 (SDNY), aff'd, 405 F. 2d 421 (CA2 1968).

[10] A summary of the conference proceedings which led to the adoption of the United Nations Convention was prepared by G. W. Haight, who served as a member of the International Chamber of Commerce delegation to the conference. Haight, Convention on the Recognition and Enforcement of Foreign Arbitral Awards: Summary Analysis of Record of United Nations Conference, May/June 1958 (1958).

When Art. II (3) was being discussed, the Israeli delegate pointed out that while a court could, under the draft Convention as it then stood, refuse enforcement of an award which was incompatible with public policy, " 'the court had to refer parties to arbitration whether or not such reference was lawful or incompatible with public policy.' " Id., at 27. The German delegate observed that this difficulty arose from the omission in Art. II (3) " 'of any words which would relate the arbitral agreement to an arbitral award capable of enforcement under the convention.' " Ibid.

Haight continues:

"When the German proposal was put to a vote, it failed to obtain a two-thirds majority (13 to 9) and the Article was thus adopted without any words linking agreements to the awards enforceable under the Convention. Nor was this omission corrected in the Report of the Drafting Committee (L.61), although the obligation

foreign corporation undertakes fraudulent action which subjects it to the jurisdiction of our federal securities laws, nothing justifies the conclusion that only a diluted version of those laws protects American investors.

Section 29 (a) of the 1934 Act provides that a stipulation binding one to waive compliance with "any provision" of the Act shall be void, and the Act expressly provides that the federal district courts shall have "exclusive jurisdiction" over suits brought under the Act. 15 U. S. C.

---

to refer parties to arbitration was (and still is) qualified by the clause 'unless it finds that the agreement is null and void, inoperative or incapable of being performed.'

"As the applicable law is not indicated, courts may under this wording be allowed some latitude; they may find an agreement incapable of performance if it offends the law or the public policy of the forum. Apart from this limited opening, the Conference appeared unwilling to qualify the broad undertaking not only to recognize but also to give effect to arbitral agreements." Id., at 28 (emphasis added).

Whatever "concern" the delegates had that signatories to the Convention "not be permitted to decline enforcement of such agreements on the basis of parochial views of their desirability," ante, at 520 n. 15, it would seem that they contemplated that a court may decline to enforce an agreement which offends its law or public policy.

The Court also attempts to treat this case as only a minor variation of The Bremen v. Zapata Off-Shore Co., 407 U. S. 1. In that case, however, the Court, per MR. CHIEF JUSTICE BURGER, explicitly stated:

"A contractual choice-of-forum clause should be held unenforceable if enforcement would contravene a strong public policy of the forum in which suit is brought, whether declared by statute or by judicial decision." Id., at 15.

That is inescapably the case here, as § 29 of the Securities Exchange Act and Wilko v. Swan make clear. Neither § 29, nor the Convention on international arbitration, nor The Bremen justifies abandonment of a national public policy that securities claims be heard by a judicial forum simply because some international elements are involved in a contract.

§ 78aa. The Court appears to attach some significance to the fact that the specific provisions of the 1933 Act involved in *Wilko* are not duplicated in the 1934 Act, which is involved in this case. While Alberto-Culver would not have the right to sue in either a state or federal forum as did the plaintiff in *Wilko*, 346 U. S., at 431, the Court deprives it of its right to have its Rule 10b–5 claim heard in a federal court. We spoke at length in *Wilko* of this problem, elucidating the undesirable effects of remitting a securities plaintiff to an arbitral, rather than a judicial, forum. Here, as in *Wilko*, the allegations of fraudulent misrepresentation will involve "subjective findings on the purpose and knowledge" of the defendant, questions ill-determined by arbitrators without judicial instruction on the law. See *id.*, at 435. An arbitral award can be made without explication of reasons and without development of a record, so that the arbitrator's conception of our statutory requirement may be absolutely incorrect yet functionally unreviewable, even when the arbitrator seeks to apply our law. We recognized in *Wilko* that there is no judicial review corresponding to review of court decisions. *Id.*, at 436–437. The extensive pretrial discovery provided by the Federal Rules of Civil Procedure for actions in district court would not be available. And the wide choice of venue provided by the 1934 Act, 15 U. S. C. § 78aa, would be forfeited. See *Wilko* v. *Swan, supra*, at 431, 435. The loss of the proper judicial forum carries with it the loss of substantial rights.[11]

---

[11] The agreements in this case provided that the "laws of the State of Illinois" are applicable. Even if the arbitration court should read this clause to require application of Rule 10b–5's standards, Alberto-Culver's victory would be Pyrrhic. The arbitral court may improperly interpret the substantive protections of the Rule, and if it does its error will not be reviewable as would the error of a federal court. And the ability of Alberto-Culver to prosecute its

When a defendant, as alleged here, has, through proscribed acts within our territory, brought itself within the ken of federal securities regulation, a fact not disputed here, those laws—including the controlling principles of *Wilko*—apply whether the defendant is foreign or American, and whether or not there are transnational elements in the dealings. Those laws are rendered a chimera when foreign corporations or funds—unlike domestic defendants—can nullify them by virtue of arbitration clauses which send defrauded American investors to the uncertainty of arbitration on foreign soil, or, if those investors cannot afford to arbitrate their claims in a far-off forum, to no remedy at all.

Moreover, the international aura which the Court gives this case is ominous. We now have many multinational corporations in vast operations around the world—Europe, Latin America, the Middle East, and Asia.[12] The investments of many American investors turn on dealings by these companies. Up to this day, it has been assumed by reason of *Wilko* that they were all protected by our various federal securities Acts. If these guarantees are to be removed, it should take a legislative enactment. I would enforce our laws as they stand, unless Congress makes an exception.

---

claim would be eviscerated by lack of discovery. These are the policy considerations which underlay *Wilko* and which apply to the instant case as well.

[12] See Knickerbocker, Oligopolistic Reaction and Multinational Enterprise (Haw. Univ. 1973); J. Vaupel & J. Curhan, The World's Multinational Enterprises (Harvard Univ. 1973). See generally Senate Committee on Finance, 93d Cong., 1st Sess., Implications of Multinational Firms for World Trade and Investment and for U. S. Trade and Labor (Comm. Print 1973); Morgan, Controlling the Multinationals, Washington Post, Nov. 17, 1973, p. A15; Diebold, Precarious Path of the Multinationals, Wall Street Journal, Aug. 17, 1973, p. 6, col. 4.

The virtue of certainty in international agreements may be important, but Congress has dictated that when there are sufficient contacts for our securities laws to apply, the policies expressed in those laws take precedence. Section 29 of the 1934 Act, which renders arbitration clauses void and inoperative, recognizes no exception for fraudulent dealings which incidentally have some international factors. The Convention makes provision for such national public policy in Art. II (3). Federal jurisdiction under the 1934 Act will attach only to some international transactions, but when it does, the protections afforded investors such as Alberto-Culver can only be full-fledged.