**FITE AND WARMATH CONSTRUCTION COMPANY, INC., Appellant,**

v.

**MYS CORPORATION et al., Appellees.**

Supreme Court of Kentucky.

Dec. 9, 1977.

---

1. The finding was that Sharp was "implicated" in the murder of the Halcombs.

G. Griffin Boyte, Warmath & Boyte, Humboldt, Tenn., Norman E. Harned, Cole, Harned & Broderick, Bowling Green, for appellant.

Trimble, Soyars & Breathitt, Hopkinsville, for MYS Corp., Hopkinsville Associates, and Manufacturers Hanover Trust Co.

Milburn C. Keith, Douglas Myers, Keith, Scent, Kirkham & Walton, Hopkinsville, for MYS Corp.

W. E. Rogers, Jr., Hopkinsville, for Planters Bank & Trust Co., Mrs. Gladys Braswell Tate, Frances Tate Rogers and W. E. Rogers, Jr., her husband, Edith Tate LaMotte and Golliday LaMotte, her husband, and Lillian Tate.

Pollard White, Hopkinsville, for Barbara Nell Land and her husband, Myrick E. Land.

Thorpe L. Wolford, Louisville, for Manufacturers Hanover Trust Co.

James R. Reid, Hopkinsville, for Henderson-Moorefield Lumber Co., Inc.

W. Edward Whitfield, Johnson & Whitfield, Hopkinsville, for Naturalite, Inc.

Charles W. Latham and James P. Hanratty (now deceased), Hopkinsville, for Charles W. Latham d/b/a Charles W. Latham Truck Lines.

Maubert R. Mills, Mills, Mitchell, Turner & Donan, Madisonville, for Cantrell Sheet Metal and Roofing Co.

John Phelps & Sons, Inc., Memphis, Tenn., for Jackson Paving Co., Inc.

REED, Justice.

The decisive issue presented by this appeal is whether the trial court was correct in enforcing a contractual agreement to arbitrate instead of applying what is generally described as the common-law rule, which regards as revocable by either party any agreement between them to arbitrate future disputes.

In November 1969, Fite and Warmath Construction Company, Inc., a Tennessee corporation, entered into a "cost-plus" contract with MYS Corporation, a Kentucky corporation wholly owned by New York residents, in which Fite agreed to serve as general contractor for MYS in the construction of a commercial shopping mall in Hopkinsville, Kentucky. The contract, executed in New York City, was a printed standard-form agreement between owner and general contractor provided by the American Institute of Architects. It contained detailed provisions concerning the rights and duties of the contracting parties. In addition, it contained an agreement to arbitrate which read:

"7.10 ARBITRATION

"7.10.1 All claims, disputes and other matters in question arising out of, or relating to, this Contract or the breach thereof, except as set forth in Subparagraph 2.2.9 with respect to the Architect's decisions on matters relating to artistic effect, and except for claims which have been waived by the making or acceptance of final payment as provided by Subparagraphs 9.7.5 and 9.7.6, shall be decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association then obtaining unless the parties mutually agree otherwise. This agreement to arbitrate shall be specifically enforceable under the prevailing arbitration law. The award rendered by the arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.

"7.10.2 Notice of the demand for arbitration shall be filed in writing with the other party to the Contract and with the American Arbitration Association, and a copy shall be filed with the Architect. The demand for arbitration shall be made within the time limits specified in Subparagraphs 2.2.10 and 2.2.11 where applicable, and in all other cases within a reasonable time after the claim, dispute or other matter in question has arisen, and in no event shall it be made after institution of legal or equitable proceedings based on such claim, dispute or other matter in question would be barred, by the applicable statute of limitations."

Thereafter, Fite commenced construction and the parties performed under the contract for about one year. On November 19, 1970, precipitated by a series of disputes between them, Fite and MYS entered into a memorandum agreement whereby they mutually agreed to terminate their contract as

of 12:00 noon, Monday, November 12, 1970. Besides reciprocal pledges of cooperation to insure an orderly transfer of the project, this memorandum recited that *the disputes* "shall be decided in accordance with the terms of the original contract," and that "*the interpretation* of the contract shall be controlled by the laws of the State of Kentucky applicable to the execution of the original contract." (emphasis supplied).

On January 8, 1970, after withdrawing from the job site, Fite filed a mechanics and materialman's lien against the project in the office of the Christian County Clerk.

On April 23, 1971, MYS filed a demand for arbitration with the American Arbitration Association pursuant to section 7.10 of the original contract as reconfirmed in the November 19, 1970, memorandum of agreement terminating the relationship.

In the arbitration demand, MYS alleged 15 separate contractual violations, asserting that Fite had failed to provide qualified supervisory personnel, had awarded subcontracts at higher than market prices, had purchased materials which did not meet trade standards or contract terms, had employed more workmen than were necessary, had permitted unauthorized changes from plans, and had caused unnecessary delays.

On May 6, 1971, Fite filed suit in the circuit court against MYS to enforce its lien (KRS 376.010, et seq.) in the amount of $1,084,246.58 and for general damages in amount of $3,800,000. On May 10, 1971, Fite filed its answer with the arbitration association in which it asserted that there was no necessity to arbitrate because of its pending suit in the state court; it also stated that any award by arbitrators would not be binding upon the state court.

After other procedural skirmishes were completed, the circuit court ruled that the arbitration agreement was enforceable and stayed the state court proceedings until arbitration was completed.

After extensive proceedings in which Fite and MYS fully participated, the arbitration tribunal rendered its award on December 9, 1973. This award was in favor of MYS against Fite in the sum of $326,141.42, plus interest at 6 per cent per annum from April 28, 1971. Despite Fite's various objections to the award, including the complaint that it did not contain separate findings of fact, the circuit court entered the arbitration award as the judgment of the court. Fite appeals. We affirm the judgment of the circuit court for the reasons later stated.

I.

The trial judge held that the United States Arbitration Act of 1925[1] applied. Section 2 of this Act declares in pertinent part that a written provision for arbitration in "any contract evidencing a transaction involving commerce" shall be valid and irrevocable and enforceable except upon such grounds as exist at law or in equity for the revocation of any contract.

From undisputed evidentiary material, the trial judge made the following significant factual findings:

Fite is a Tennessee corporation with its principal place of business in Tennessee. MYS is a Kentucky corporation with its principal place of business in New York, New York. The supervising architects are residents of New York. The construction loan which financed the project was made by the Manufacturers Hanover Trust Company of New York, New York. Eighty-eight per cent of the subcontractors engaged in the construction project were nonresidents of Kentucky and many of the employees crossed the Kentucky-Tennessee border daily to perform work on the mall. The majority of the tenants of the mall are corporations incorporated under the laws of a state other than Kentucky and maintaining their respective principal places of business in a state other than Kentucky.

After reciting these factual findings, the trial judge stated: "The court finds as a matter of fact at the time the parties entered into the contract on November 11, 1969, in New York, New York, both parties contemplated a transaction involving inter-

---

1. 9 U.S.C.A. Sec. 1, et seq.

state commerce within the meaning of the Federal Arbitration Act, Title 9, U.S.C. Sections 1 and 2." Fite argues that the Supreme Court of the United States has recognized that the U. S. Arbitration Act is not applicable in state courts. It relies as authority upon the cases of *Prima Paint Corporation v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967), and *Bernhardt v. Polygraph Company of America, Inc.,* 350 U.S. 198, 76 S.Ct. 273, 100 L.Ed. 199 (1956).

In our view it is unnecessary to explore the problems created when the historical setting of the passage of the U. S. Arbitration Act of 1925 is considered. Suffice it to say that the Arbitration Act was passed before the decision in *Erie R. Company v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), which mandated that federal courts in diversity cases were bound to follow state rules of decision in matters which are "substantive" or where the matter is "outcome determinative." There is the additional consideration that in 1925 the Supreme Court interpreted the scope of what constituted interstate commerce in a much more restrictive fashion than was true by later decisions of that court.

In *Bernhardt,* supra, a diversity case, the Supreme Court interpreted the coverage of the U. S. Arbitration Act, particularly the stay provisions of section 3, as limited to maritime transactions and transactions in interstate commerce. After holding that the arbitration agreement in the case did not involve commerce nor affect a maritime transaction, the court decided that for purposes of the *Erie* doctrine arbitration was outcome determinative, thus requiring a federal court to determine the enforceability of an arbitration agreement not in interstate commerce under state law. The case did not hold, as asserted by Fite, that the U. S. Arbitration Act was not applicable in state courts.

Two years after the decision in *Bernhardt,* the Sixth Circuit held in *American Airlines, Inc. v. Louisville and Jefferson County Air Board,* 269 F.2d 811, that section 2 of the U. S. Arbitration Act created

substantive law enacted in the exercise of Congress' plenary power over interstate commerce and state law must give way. Then in 1959, the Second Circuit decided the case of *Robert Lawrence Co. v. Devonshire Fabrics, Inc.,* 271 F.2d 402, wherein the court held that the Federal Arbitration Act was a declaration of national law equally applicable in state or federal courts.

The Supreme Court did not address itself to the problem again until 1967 in *Prima Paint Corporation v. Flood and Conklin* (1967), 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed. 1270. Here, the Supreme Court did not base its decision on the *Lawrence* opinion but instead held that the Federal Arbitration Act was based upon the incontestable federal foundations of control over interstate commerce and over admiralty. As to the effect of the decision in *Prima Paint,* we are more persuaded by the views expressed in the opinion of the Court of Appeals of New York in *Matter of Rederi,* 25 N.Y.2d 576, 307 N.Y.S.2d 660, 255 N.E.2d 774 (1970), than by the trial court opinion in *Pullman, Inc. v. Phoenix Steel Corp.,* Del., 304 A.2d 334 (1973).

■ The substance of the holding in *Rederi* is that what was said by the Supreme Court in *Prima Paint* leads to the inevitable conclusion that the U. S. Arbitration Act has to be applied in state courts as well as in the federal courts where the suit involves a contract evidencing a transaction in interstate commerce regardless of the forum in which it is brought. According to *Rederi,* if the result were otherwise the nub of the policy underlying *Erie R. Company v. Tompkins* would be defeated. The *Erie* rule was designed to prevent a result that for the same transaction the accident of a suit by a nonresident litigant in a federal court instead of in a state court a block away should lead to a substantially different result. The Court of Appeals of New York said in *Rederi* that this rationale would apply even if the Supremacy Clause did not require it to conform to and apply the provisions of the federal statute. Any other conclusion would place the court's stamp of approval on a particularly offensive form of forum-shopping.

We are fortified in our conclusion by a well-reasoned opinion of the Court of Appeals of Indiana in *Pathman Const. Co. v. Knox County Hospital Ass'n,* Ind.App., 326 N.E.2d 844 (1975), which specifically rejects the opinion in the Delaware case of *Pullman, Inc.,* supra. We, therefore, hold that the provisions of the U. S. Arbitration Act of 1925 apply to actions brought in the courts of this state where the purpose of the action is to enforce voluntary arbitration agreements in contracts evidencing transactions in interstate commerce.

## II.

Having determined that the Federal Arbitration Act applies in contracts involving interstate commerce, we are required to determine whether the contract in this case involves interstate commerce. The United States Supreme Court, both in *Bernhardt,* supra, and *Prima Paint,* supra, adopted a broad definition of the sort of transaction which would constitute a contract evidencing a transaction in interstate commerce. Fite advances the simplistic argument that the contract in the case before us is one for construction in a single county in Kentucky and that the transaction should be characterized as "construction not commerce." We agree with MYS that a construction contract, as any other kind of contract, may involve interstate commerce.

In *Metro Industrial Painting Corp. v. Terminal Const. Co.,* 287 F.2d 382 (2 Cir. 1961), the court held that a subcontract to perform painting work made between residents of New York and residents of Connecticut and New Jersey who did painting work on a project within the State of Florida was a transaction involving interstate commerce within the meaning of the U. S. Arbitration Act. The court pointed out that 20 per cent of the work force at the Florida site, as well as a substantial number of supervisory personnel, were transported from New York City to Florida; that the materials used by the subcontractors' employees were purchased from other states as were materials used by other subcontractors, many of whom were from out of state.

In *Pathmam,* supra, the court pointed out that the parties to the original contract were located in separate states and that it was a fair conclusion that at least some interstate activity was contemplated. The court also pointed to the fact that substantial amounts of materials continued to travel to the job site from out of the state, some of which were manufactured particularly for the construction project. Additionally, the court noted that certain employees crossed state lines in order to work at the job site. The project was for the building and remodeling of a hospital. The contract was for $3,767,000. The dollar value of the out-of-state contracts totaled over $700,000. That court held the hospital itself was not involved in interstate commerce, but the contract in question involved a transaction involving interstate commerce. The cases cited by Fite generally involved instances where the applicability of the federal act was not in issue or situations where its applicability was questionable or nonexistent.

Under the Fite contract, the total gross charges made by the nonresident subcontractors and vendors amounted to $3,880,252.42. We are impressed by the specific findings of fact made by the trial judge. They are not attacked as erroneous. They squarely support his conclusion that this contract evidenced a transaction in interstate commerce. We, therefore, hold that the trial judge properly applied the mandates of the U. S. Arbitration Act in this case.

## III.

The effect of our decision makes enforceable a contract to arbitrate a future dispute where applicable federal law so provides. We do not consider, however, that we are displacing a viable public policy of this state. The process of arbitration has had an interesting history in this state as is thoroughly considered in an article: Goldman, A Proposed Arbitration Act for Kentucky, 22 ARB. J., 193, 221 (1967). The device of arbitration has been specifically approved by our State Constitution since

1799.[2] Our case law has stated that it is the policy to favor the settlement of disputes by means of arbitration. The legislature has adopted an arbitration statute, Chapter 417 of the Kentucky Revised Statutes. This Act empowers the parties to voluntarily submit an existing dispute to the process of arbitration. The spectre remains, however, of the applicability of the common-law rule which as a matter of judge-made law prohibits the enforceability of agreements to arbitrate future disputes based on the questionable justification that such agreements "oust the courts of jurisdiction." This rationale has not escaped without serious criticism. See W. Sturges, Commercial Arbitration and Awards, Sec. 15 (1930). For a helpful recent discussion also see Gilbert, Choice of Forum Clauses in International and Interstate Contracts, 65 Ky. L.J. 1, 15 (1976).

In 1974 the Supreme Court of the United States in the case of *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 94 S.Ct. 2449, 2457, 41 L.Ed.2d 270 (1974), said:

"An agreement to arbitrate before a specified tribunal is, in effect, a specialized kind of forum-selection clause that posits not only the situs of the suit but also the procedure to be used in resolving the dispute. The invalidation of such an agreement in the case before us would not only allow the respondent to repudiate its solemn promise but would, as well, reflect a 'parochial concept that all disputes must be resolved, under our laws and in our courts.'" (citation omitted).

Here, the Supreme Court appears to place arbitration clauses in a subcategory of choice-of-forum provisions. Consider then the position of the American Law Institute in the Restatement (2d) of Conflict of Law. Section 80 states: "The parties' agreement as to the place of the action cannot oust a state of judicial jurisdiction, but such an agreement will be given effect unless it is unfair or unreasonable."

■ We are not concerned here with an adhesion contract or one where the bargaining power of the parties is disparate. We deal rather with an agreement voluntarily entered into by sophisticated and knowledgeable businessmen concerning a financial transaction of considerable magnitude. In such situation, we find no real support for the proposition that one of the parties is free to repudiate his promise. We are convinced that the application of federal law in this instance does not displace a fundamental public policy of this state.

### IV.

■ Fite complains because the arbitrators made no findings of fact nor did they specify the basis of their decision. According to Fite, this leaves it in an untenable position so far as the claims of subcontractors are concerned. Arbitrators need not disclose the facts or reasons behind their award. *Bernhardt*, supra, at footnote 4. Their award may be made without explanation of their reasons and without a complete record of their proceedings. *Wilko v. Swan*, 346 U.S. 427, 435–438, 74 S.Ct. 182, 186, 188, 98 L.Ed. 168 (1953). Kentucky law is in accord. See *Smith v. Hillerich and Bradsby Company*, Ky., 253 S.W.2d 629 (1953).

■ The sole judgment the trial court has entered is the one adopting the arbitration award as the judgment of the court. This judgment was made final and appealable under CR 54.02. The other parties to the lawsuit were not parties to the arbitration proceedings, nor did Fite and MYS in their agreement undertake to bind third parties by the arbitration process. The courthouse doors remain open to Fite to litigate its rights and liabilities apart from its disputes with MYS. We are unable to agree with Fite that it has been denied due process.

The judgment of the circuit court from which this appeal was taken is affirmed.

All concur.

---

**2.** Our present state Constitution provides at section 250: "It shall be the duty of the General Assembly to enact such laws as shall be necessary and proper to decide differences by arbitrators, the arbitrators to be appointed by the parties who may choose that summary mode of adjustment."