NOONAN, Circuit Judge.
Alan Richards and 573 other individuals (collectively, the plaintiffs or the Names) brought suit against the Corporation of Lloyd’s (Lloyd’s) and against Lloyd’s of London, a- community of enterprises characterized by the plaintiffs as an Unincorporated Association (the Unincorporated Association). The plaintiffs alleged securities fraud under the Securities Act of 1933, 15 U.S.C. § 77a (the 1933 Act) and under the Securities Exchange Act of 1934, 15 U.S.C. § 78a (the 1934 Act). The suit also alleged related violations of the Racketeer Influenced and Corrupt Organizations Act of 1970, 18 U.S.C. § 1961 et seq. (RICO). The plaintiffs further alleged breach of state Blue Sky laws, breach of fiduciary duty, and common law fraud. • On motion of the defendants under *-160 Fed.R.Civ.P. 12(b)(3) the district court dismissed the plaintiffs’ action.
The primary question presented on appeal is whether forum selection and choice of law provisions in the contracts signed by the Names (the Choice Clauses) require the application of English law to the plaintiffs’ claims and the confinement of these claims to the courts of England. Holding that the Choice Clauses are void because they violate the 1933 Act and the 1934 Act, we reverse the district court’s dismissal of the Names’ federal claims. We affirm the district court’s dismissal of the claims under the Blue Sky laws and the common law claims. We remand for consideration by the district court the amenability to suit of the Unincorporated Association.
Without passing on the truth of the allegations, we set out the plaintiffs’ case as it is alleged by them.

THE ALLEGATIONS

The Unincorporated Association is engaged in the business of writing insurance and reinsurance. Its principal place of business is London, England. Its principal parts consist of the corporation (Lloyd’s, the other defendant in this case); underwriting agents; brokers; and syndicates of underwriters. The corporation, Lloyd’s, is governed by the Council for Lloyd’s; the Council has “virtually complete control” over all of the operations of Lloyd’s, including the operations of the underwriting agents and the .brokers, and “virtually dictates the exact form of agreements and contents of agreements that are to be used ... and dictates not only the policies but the practices of those who constitute the Lloyd’s community.”
The members of each syndicate underwriting insurance are known as Names. They are divided into Working Names, a group of insiders who devote essentially full time to the business of insurance at Lloyd’s, and External Names, recruited from all over the world. The Working Names control Lloyd’s. The External Names are “totally passive investors” and “are absolutely prohibited” from being involved in the “underwriting process.” They make a deposit, usually in the form of a letter of credit, equal to a percentage of the premium income they expect to receive in a given year from the underwriting syndicate of which they are members. They have several, not joint, liability on the policies written by the syndicate. The liability of each Name is unlimited.
Between 1970 and 1993 Lloyd’s sought to increase its underwriting capacity and to do so undertook “a major recruitment program in the United States.” Representatives of Lloyd’s came to the United States to carry out the recruitment by offering investment contracts by which residents of the United States might become External Names at Lloyd’s. Lloyd’s provided printed information on its history and operations as part of the campaign. The United States mails were used to provide this information and to send questionnaires, applications, and agreements to potential Names resident in the United States. Brokerage firms in the United States were paid commissions by Lloyd’s to recruit Names in this country. Existing Names in the United States were also given financial incentives to recruit additional Names here. The information furnished by Lloyd’s did not meet the standards required of prospectuses by the Securities Exchange Commission (the SEC). The investment contracts offered by Lloyd’s were securities but were not registered under either federal or state law.
As a result of its efforts, Lloyd’s raised over $600 million in letters of credit and deposits furnished by residents of the United States who became External Names. Lloyd’s also enormously expanded its underwriting capacity by securing the unlimited liability on insurance contracts from Lloyd’s of 3,196 residents of the United States recruited to become External Names at Lloyd’s. The plaintiffs are a portion of those so recruited.
Plaintiffs, the Names of this case, were defrauded by Lloyd’s in at least one of two ways: (1) Lloyd’s put them on syndicates reinsuring long tail asbestos and toxic waste claims which had arisen prior to these Names becoming members of such syndicates; (2) Lloyd’s put them on syndicates carrying an unusual concentration of risks *-159 because of a reinsurance scheme (the LMX Spiral) that operated as a species of scam. In neither case did Lloyd’s inform the plaintiffs of the magnitude of their exposure although Lloyd’s was aware of the magnitude. In each case Lloyd’s acted to benefit Working Members and other insiders at Lloyd’s while pushing large liabilities foreseen by Lloyd’s, but undisclosed by it, upon the unsuspecting and uninformed External Names of whom the plaintiffs form a portion.
In 1986, these plaintiffs each were required by Lloyd’s to execute in the United States a contract with Lloyd’s entitled “General Undertaking.” Paragraph 2.1 of this agreement reads as follows: “The rights and obligations of the parties arising out of or relating to the Member’s membership of, and/or underwriting of insurance, business at, Lloyd’s and any other matter referred to in this Undertaking, shall be governed by and construed in accordance with the laws of England.” Paragraph 2.2 of this agreement reads in relevant part as follows: “Each party irrevocably agrees that the courts of England shall have exclusive jurisdiction to settle any dispute and/or controversy of whatsoever nature arising out of or relating to the Member’s membership of, and/or underwriting of insurance business at Lloyd’s....” These two provisions, the Choice Clauses, had not been in General Undertakings prior to 1986 but that group of plaintiffs who had become Names prior to 1986 and signed earlier General Undertakings without the Choice Clauses were required by Lloyd’s to execute the 1986 form as a condition of remaining as Names. The group of plaintiffs who became Names in 1986 and thereafter were required by Lloyd’s to execute the 1986 form as a condition of becoming Names. To neither group of plaintiffs did Lloyd’s disclose the information it possessed as to the fraud or frauds being practised on them. The Choice Clauses were themselves obtained by fraud.
Such are the plaintiffs’ allegations.

PROCEEDINGS

On October 9, 1994 the plaintiffs filed in the Southern District of California an amended complaint containing these allegations. The Unincorporated Association did not answer, and the plaintiffs moved for a default judgment against it. Invoking the Choice Clauses, Lloyd’s moved to dismiss on the grounds of improper venue, also on grounds of forum non conveniens and/or res judicata. Various declarations were submitted by both sides as well as pleadings and judgments in other eases. In argument, Lloyd’s relied on the Choice Clauses and forum non conve-niens.
On April 28,1995 the district court entered its order dismissing the complaint. “Forum-selection clauses,” the court reasoned, “are presumptively valid,” to be set aside only if “unreasonable” under the circumstances. Such circumstances, the court found, had not been shown here. Relying on Roby v. Corporation of Lloyd's, 996 F.2d 1353 (2d Cir.), cert. denied, 510 U.S. 945, 114 S.Ct. 385, 126 L.Ed.2d 333 (1993), the court held that the remedies available in England were sufficient to protect the American investors. Refining the Second Circuit’s reasoning in Roby, the court noted that the SEC’s inaction towards Lloyd’s “undercuts or dilutes the strength of the policy argument that insufficient deterrence exists for Lloyd’s” under the laws of England. The court found insufficient evidence to support the allegation that the Choice Clauses themselves were obtained by fraud.
The plaintiffs moved for reconsideration. On August 4, 1995 the district court denied this motion, adding: “The Dismissal Order dismissed plaintiffs’ complaint in its entirety and as to all parties. Therefore the court dismisses as moot” plaintiffs’ motion for a default judgment against the Unincorporated Association.
The plaintiffs appeal.

ANALYSIS

The validity of the Choice Clauses is first attacked by the plaintiffs on the ground that these clauses were themselves procured by fraud. On this point as it affects the jurisdiction of the district court, the allegations of the plaintiffs are not to be taken as true, as would be the rule in an ordinary motion to dismiss under Rule 12. To the contrary, we have held that such clauses are *-158 good, “[a]bsent some evidence submitted by the party opposing enforcement of the clause to establish fraud, undue influence, overweening bargaining power, or such serious inconvenience in litigating in the selected forum so as to deprive the party of a meaningful day in court....” Argueta v. Banco Mexicano, 87 F.3d 320, 324 (9th Cir.1996) (italics in original) (quoting Pelleport Investors, Inc. v. Budco Quality Theatres, Inc., 741 F.2d 273, 280 (9th Cir.1984)). The district court here found that the plaintiff had not produced sufficient evidence of fraud in the procurement of the Choice Clauses. We defer to this factual finding. For purposes of defeating the Rule 12(b)(3) motion and for purposes of this appeal (but not as the law of the case because the plaintiffs have not had the chance to present their full case), the Choice Clauses must be deemed not obtained by fraud.
We express no view on whether the Names’ participation in Lloyd’s constitutes the purchase of a “security” within the meaning of the Securities Act of 1933 and the Securities Exchange Act of 1934. For purposes of this appeal, we assume the truth of the Names’ allegation that Lloyd’s was engaged in the offer and sale of securities. Determining whether the Names can prove this allegation will require further development of the record in the district court at trial or on suihmary judgment.
We turn to the validity of these clauses under the controlling statutes. Doing so, we take the plaintiffs’ allegations as to their causes of action to be true. We look not at • evidence — for the plaintiffs do not have to prove their ease at the pleading stage — but at what the plaintiffs say their case is.
The Statutes’ Bar. Section 14 of the 1933 Act provides:
Any condition, stipulation, or provision binding any person acquiring any security to waive compliance with any. provision of this title or of the rules and regulations of the Commission [the SEC] shall be void.
15 U.S.C. § 77n. The bar of Section 29a of the 1934 Act is substantially the same. 15 U.S.C. § 78ce(a). The Choice Clauses operate to effect such waivers. Accordingly, under the precise terms of these two statutes, the Choice Clauses are void.
The district court made an error of law in supposing that the Choice Clauses were unenforceable only if unreasonable. Congress had already determined that such clauses were void. It was not for a court to weigh their reasonableness, not for a court to say whether they offended any policy of the United States. The policy decision had been made by the legislature.
Lloyd’s asks us to look at Scherk v. Alberto-Culver Co., 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974) where the Supreme Court, 5-4, held that in “an international commercial transaction” the parties’ agreement to arbitrate before the International Chamber of Commerce in Paris any controversy or claim that “shall arise out of this agreement” should be upheld despite the plaintiffs’ reliance on § 10b of the 1934 Act. Lloyd’s overlooks both the facts and the reasoning of this precedent. As to the facts: the property being purchased was that of three businesses organized under the laws of Germany and Liechtenstein. Negotiations for the contract took place in the United States, England and Germany and involved consultations with legal and trademark experts from these countries and from Liechtenstein. The contract was signed in Austria. The businesses being bought were engaged in activities, “largely if not entirely, directed to European markets.” Id. at 515, 94 S.Ct. at 2455.
As to the reasoning: the Supreme Court stressed “the orderliness and predictability essential to any international business transaction” and the dangers presented by a “parochial refusal” to “enforce an international arbitration agreement.” Id. at 516, 94 S.Ct. at 2456. The Supreme Court quoted with approval from The Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 9, 92 S.Ct. 1907, 1912-13, 32 L.Ed.2d 513 (1972): “We cannot have trade and commerce in world markets and international waters exclusively on our terms, governed by our laws, and resolved in our courts.” The Supreme Court said that for these reasons it held “that the provisions of the Arbitration Act cannot be ignored in this case.” Scherk, 417 U.S. at 513, 94 S.Ct. *-157 at 2454. The Supreme Court relied on this act of Congress, 9 U.S.C. § 1, which it found to represent a policy not easily reconcilable with the Securities Exchange Act. Id. at 512, 94 S.Ct. at 2453-54 (referring to the Court’s earlier statement in Wilko v. Swan, 846 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953)). With two federal statutes in conflict, the considerations of international commerce tipped the balance. An exception to “the clear provisions of the Arbitration Act” would not be accepted. Scherk, 417 U.S at 517, 94 S.Ct. at 2456.
The fragmentary contacts with the United States of the contract in Scherk distinguish that contract from the contracts here where, according to the allegations we must accept at this state of the pleadings as true, the offerees were recruited in the United States, agents of the offeror were paid in the United States, documents material to the contracts were mailed in the United States and executed in the United States, and residents of the United States invested large sums of money and remained liable to the full extent of their assets for indefinite amounts of money. Factually distinct from Scherk, the ease is also distinct in terms of the statutes involved. As is apparent from the Supreme Court’s reasoning, the Court in Scherk had to decide which one of two federal statutes to apply. It chose to apply the Arbitration Act. It did not weigh reasonableness or pit amorphous policy against a command of Congress.
Is there a significant difference between a policy objection to enforcement of the anti-waiver bars and a statutory obstacle to such enforcement? We believe there is. Where a statute exists, a policy has been given form and focus and precise force. A statute represents a decision by the elected representatives of the people as to what particular policy should prevail, and how. A policy objection represents judicial reasoning in the area where the federal statutes, if they are to the contrary, must rule. A statutory obstacle represents a legislative determination that is of at least equal weight with another statute. Consequently, what was decided when the Arbitration Act stood in the way of the antiwaiver bars is not helpful when no statute stands in the way of their enforcement.
The Supreme Court in Mitsubishi Motors v. Soler Chrysler-Plymouth, 473 U.S. 614, 637 n. 19, 105 S.Ct. 3346, 3359 n. 19 (1985) has already declared in dicta in an antitrust case what it thinks of contract clauses operating in an international transaction, as the Choice Clauses do here, contrary to the statutes of the United States: “We merely note that in the event the choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party’s right to pursue statutory remedies for antitrust violations, we would have little hesitation in condemning the agreement as against public policy.” There is no question that the Choice Clauses operate in tandem as a prospective waiver of the plaintiffs’ remedies under the 1933 and 1934 Acts. If the Supreme Court would condemn such clauses where they work against a public policy embodied in statutes even though the statutes themselves do not void the clauses, a fortiori the Supreme Court would condemn similar clauses when they run in the teeth of two precise statutory provisions making them void.
There is an additional reason why application of the Choice Clauses is barred by precedent that explicitly refers to the statutory bars of the 1933 and 1934 Acts: In securities cases upholding arbitration clauses by virtue of the Arbitration Act, the Supreme Court has observed that arbitration changes procedure but that the arbitrators will apply the substantive securities law of the United States where that law is applicable. Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 481, 109 S.Ct. 1917, 1920, 104 L.Ed.2d 526 (1989); Shearson/American Express v. McMahon, 482 U.S. 220, 232, 107 S.Ct. 2332, 2340-41, 96 L.Ed.2d 185 (1987). In Scherk because of the slight contacts with the United States the proper law to be applied was uncertain and so could be fixed by agreement. See Scherk, 417 U.S. at 516, 94 S.Ct. at 2455-56. The strong implication is that where there is substantial contact with the United States even the Arbitration Act could not authorize the waiver of the substantive protections of the 1933 and 1934 Acts. What the Supreme *-156 Court has in mind by “substantive” provisions of these Acts is illustrated by “the provision in section 12(2) of the 1933 Act placing on the seller the burden of proving lack of scienter when a buyer alleges fraud.” Rodriguez de Quijas, 490 U.S. at 481, 109 S.Ct. at 1920. By this test, the Choice Clauses require the waiver of substantive provisions of the 1933 and 1934 Acts- and are consequently void.
Lloyd’s urges not as controlling but persuasive precedent the decision of other circuits in cases pursued by certain Names against Lloyd’s. The first of these, Riley v. Kingsley Underwriting Agencies, Ltd., 969 F.2d 953 (10th Cir.1992), cert. denied, 506 U.S. 1021, 113 S.Ct. 658, 121 L.Ed.2d 584 (1992) is a federal securities case against Lloyd’s where the court did not discuss the statutory bars and where the issue was clouded by the presence of a clause requiring arbitration. It is not an apt precedent here.
We recognize that our holding creates a conflict with the interpretation of the Lloyd’s Choice Clauses in other cases. E.g., Allen v. Lloyd's of London, 94 F.3d 923 (4th Cir.1996); Bonny v. Society of Lloyd's, 3 F.3d 156 (7th Cir.1993), cert. denied, 510 U.S. 1113, 114 S.Ct. 1057, 127 L.Ed.2d 378 (1994); and Roby v. Corporation of Lloyd's, 996 F.2d 1353 (2d Cir.), cert. denied, 510 U.S. 945, 114 S.Ct. 385, 126 L.Ed.2d 333 (1993). Although we do not lightly deviate from the conclusions of our fellow circuits, we are convinced that those cases improperly disregard the statutory antiwaiver provisions of the Securities Acts. A comprehensive review of these cases has recently come to the same critical conclusion. Darrell Hall, Note, No Way Out: An Argument Against Permitting Parties to Opt Out of U.S. Securities Law In International Transactions, 97 Colum.L.Rev., 57, 74-78 (1997).
These other circuit' courts examined whether the Choice Clauses are enforceable by applying an analysis announced in The Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972). The Bremen held that choice-of-forum clauses should be enforced against a party unless it could show that enforcement would be unreasonable or unjust, or that the clause was invalid due to fraud or overreaching. Id. at 15, 92 S.Ct. at 1916. These other circuit courts interpreted The Bremen and Carnival Cruise Lines, Inc. v. Shute, 499 U.S. 585, 595, 111 S.Ct. 1522, 1528, 113 L.Ed.2d 622 (1991), as setting forth a “reasonableness” test to evaluate choice-of-forum clauses. Allen, 94 F.3d at 928; Bonny, 3 F.3d at 160; Roby, 996 F.2d at 1363. One factor making a clause “unreasonable,” and hence unenforceable, is if enforcement of the clause would contravene a strong public policy of the forum state. Allen, 94 F.3d at 928; Bonny, 3 F.3d at 160; Roby, 996 F.2d at 1363. In The Bremen, the Supreme Court stated that “[a] contractual choice-of-forum clause should be held unenforceable if enforcement would contravene a strong public policy of the forum in which suit is brought, whether declared by statute or by judicial decision.” Bremen, 407 U.S. at 15, 92 S.Ct. at 1916.
Applying this test, these other circuits have determined that the American securities laws do not prevent application of the Choice Clauses. Deciding that the remedies available under English law are adequate to effectuate the anti-fraud purposes of the American securities laws, these circuit courts concluded that the Choice Clauses were reasonable and should be enforced.
For instance, as posed by the Seventh Circuit in Bonny, “the fundamental question” became whether the remedies available in England subverted “the public policy” of the Acts. Bonny, 3 F.3d at 161. The court found that the plaintiffs could sue Lloyd’s in England for fraud and for breach of contract; that they could sue Member’s Agents for breach of fiduciary duty; that upon application of [an English] Secretary of State they might obtain an injunction and remedial orders; and that, upon a finding of criminal liability under the [English] Financial Services Act, they “could potentially receive some compensation for their injuries. More importantly, such criminal penalties serve as an important deterrent against exploitation of United States investors.” Id. In our view, however, the reasonableness of the Choice Clauses is not determinative of their enforceability. The Securities Acts’ anti-waiver provisions themselves render the *-155 Choice Clauses void, making it unnecessary to examine whether enforcement of the clauses would be reasonable under the test set forth in The Bremen and Carnival. Notably, The Bremen did not involve the applicability of a statutory anti-waiver provision like that contained in the Securities Acts. The Supreme Court was reviewing a judgment of the Fifth Circuit holding that this choice-of-forum clause contained in an international admiralty contract was unenforceable because it was contrary to public policy.
Reading The Bremen closely dispels the notion that choice-of-forum clauses are generally disfavored. The Bremen, 407 U.S. at 10, 92 S.Ct. at 1913. Instead, those clauses are presumed valid, though the “reasonableness” test allows the presumption to be rebutted. Id. However, The Bremen did not apply the “reasonableness” analysis in the face of a statute purporting to decide the question of a choice-of-forum clause’s enforceability. The Bremen announced a reasonableness test to evaluate choice-of-forum clauses when Congress has not directly spoken to the issue. The “unreasonableness” test does' not apply here where Congress specifically enacted antiwaiver provisions in the Securities Acts.
Further support of this conclusion is found in the Supreme Court’s Carnival decision, specifically in its discussion of the effect of the Limitation of Vessel Owner’s Liability Act, 46 U.S.C.App. § 183c. The Carnival Court does not apply The Bremen’s “reasonableness” analysis to determine whether this statute renders unenforceable a choice-of-forum clause contained in a contract between a cruise ship and a passenger. The Court discusses The Bremen analysis separately, concluding that the forum-selection clause is not unreasonable under The Bremen factors. When analyzing section 183c, however, the Court simply rules that the forum-selection clause did not violate the statute. Carnival, 499 U.S. at 596, 111 S.Ct. at 1528-29.
Congress was not ignorant of the potential international character of securities transactions. Congress specifically modified the 1933 Act to cover transactions in foreign commerce. S.Rep. No. 47, 73d Cong., 1st Sess. (1933) (accompanying S. 875.) A court should not apply the reasonableness test or say whether the clauses offended any policy of the United States when Congress has expressly made that determination. We do not believe that we should turn the clock back to 1929 or introduce caveat emptor as the rule governing the solicitation in the United States of investments in securities by residents of the United States. See Jennifer M. Eck, Note, “Turning Back The Clock: A Judicial Return to Caveat Emptor For U.S. Investors In Foreign Markets”, 19 N.C.J. Int’l L. & Com.Reg. 313 (1994).
The dissent makes several remarkable rhetorical points: (1) Our decision means that Americans betting on chicken fights in Zam-boanga could sue for breach of American securities law. (2) Oür decision subjects Lloyd’s “to the varying requirements of the different countries in which the Names might reside.” (3) It is “unlikely” that, without the Choice Clauses, Lloyd’s would engage in underwriting risks at reasonable premiums. More dispassionate conclusions would be that Americans can sue over a foreign gaming venture only if its securities are peddled in the United States; subjecting sales of Lloyd’s securities to our securities laws says nothing at all as to the legal fate of Lloyd’s in the rest of the world; and Lloyd’s will go on writing insurance as long as the business is profitable, Lloyd’s will merely be more circumspect in raising capital in the United States. The fundamental issue dividing the majority and minority does not depend upon rhetorical flourishes but on whether the courts or Congress determines our national policy after Congress has spoken.
Even undertaking the analysis that the other circuits undertook, we cannot agree with their evaluation of the remedies available. In this not easy task we are aided by the SEC, which has entered this case on appeal as a friend of the court. We do not defer to its position as one arrived at by agency rulemaking (which has not occurred), but we do draw on the SEC’s expertise when it points to the deficiencies in the remedies provided the plaintiffs by English law. Three major deficiencies exist: (1) There is no, remedy in England for failure to register securities as required by Section 12(1) of the *-154 1938 Act. (2) There is no remedy in England against Lloyd’s for negligent misrepresentation as provided by Section 12(2); the Lloyd’s Act, 1982, expressly immunizes Lloyd’s from any claim “for negligence or other tort, breach of duty or otherwise ... unless the act or omission complained of ... was done or omitted to be done in bad faith.” (3) In the United States there is liability for controlling persons under Section 15 of the 1938 Act and Section 20(a) of the 1934 Act; there is no such liability in England. We need not go further to list the various procedural and financial requirements noted by the plaintiffs which would act as hurdles to obtaining relief in England. Major gaps exist in the English substantive law of securities fraud. The available English remedies are not adequate substitutes for the firm shields and finely honed swords provided by American securities law.
The dissent believes a “plain, speedy and adequate remedy” exists if the plaintiffs had sued other defendants, some of whom the dissent acknowledges to be insolvent. Such hypothetical and derisory possibilities are not alternative remedies at all so far as concerns the defendants the plaintiffs did choose to sue. The dissent goes on to disparage suit in a federal court as a suit in California, a “plaintiff-friendly environment.” The dissent takes no equivalent glance at the environment likely to surround American investors seeking redress in London against Lloyd’s of London, a business corporation so powerful that it has obtained from the British legislature substantial immunities. A plain, speedy, and adequate remedy for the wrongs alleged by the plaintiffs is not shown to exist in Britain.
The RICO Claims. The plaintiffs’ Tenth Claim for Relief, for alleged violations of RICO, rests in part on allegations of “multiple acts of fraud in the sale of securities” in violation of the 1933 and 1934 Acts and in part on allegations of mail fraud in violation of 18 U.S.C. §§ 1341 and 1343. The allegations of securities fraud tie the RICO allegations to the federal securities claims but the bar on the waiver of rights under the Securities Acts is not a bar of' waiver of rights under RICO, so our analysis of the Securities Act is not controlling. At the same time the record is bare as to what remedy an English court would provide a RICO claim. Consequently, we remand to the district court to determine in the light of this opinion whether the Choice Clauses are reasonable in their impact on the obligations established by RICO.
Forum non conveniens. Lloyd’s asks us to affirm on the basis of forum non conve-niens as a ground apparent on the record although not a ground adopted by the district court. We decline to do so. Dismissal for forum non conveniens requires a balancing of a multitude of factors first properly found and weighed by the district court. We do note the heavy burden to be sustained by the defendants in the light of our holding that Lloyd’s by contract cannot avoid application of the federal securities statutes.
The Blue Sky Claims. The Blue Sky Law claims are pleaded perfunctorily and without reference to any particular state law prohibitions against the Choice Clauses. For the reasons stated by the several circuit courts that have upheld the Choice Clauses, we hold that they bind the parties in the absence of any statutory provision annulling them.
The Common Law Fraud And Breach Of Fiduciary Duty Claims. These claims, too, must be pursued according to the Choice Clauses. No statute of the United States is to the contrary. The English remedies appear adequate.
The Status Of The Unincorporated Association. Fed.R.Civ.P. 17(b) provides:
The capacity of a corporation to sue or be sued shall be determined by the law under which it was organized. In all other cases capacity to sue or be sued shall be determined by the law of the state in which the district court is held, except (1) that a partnership or other unincorporated association, which has no such capacity by the law of such state, may sue or be sued in its common name for the purpose of enforcing for or against it a substantive right existing under the Constitution or laws of the United States.
*-153 See, e.g., Sierra Ass’n v. FERC, 744 F.2d 661, 662 (9th Cir.1984).
The district court did not rule on the plaintiffs’ motion to grant a default against the Unincorporated Association, which did not answer the plaintiffs’ complaint. On remand', the district court should rule on the motion in the light of Rule 17(b) and in the light of such facts as the district court finds after a hearing.

CONCLUSION

For the reasons stated, the judgment of the district court is AFFIRMED in its dismissal of the Blue Sky law, common law fraud, and breach of fiduciary duty claims. The judgment of the district court is REVERSED as to its dismissal of the federal securities and RICO claims and the dismissal of the plaintiffs’ default motion against the Unincorporated Association. The case is REMANDED to the district court.