107 F.3d 1422
 65 USLW 2598, Fed. Sec. L. Rep. P 99,425,
97 Cal. Daily Op. Serv. 1691,
97 Daily Journal D.A.R. 3209
 Alan RICHARDS, et al., Plaintiffs-Appellants,
v.
LLOYD'S OF LONDON, an unincorporated association, et al.,
Defendants-Appellees.
John R. NORTON, III; Doris S. Norton; Diane B. Allison;
Charles G. Bentzin; F.M. Binkley; Delmar A. Brady; Samme
Jo Brady; George Maning Close; Russell M. Collins; Peter
Dwares; Robert Flesvig; Donald P. Gallop; Charles A.
Gerlach, Jr.; Robert W. Gerwig; Richard C. Henry; Michael
C. Hirsh; R. William Johnston; James H. Kayian; Joanne S.
Kayian-Olooney; Suzanne Kayian; Lowell Conrad Lundell;
Judith M. Ott; H.E. Rainbolt; David L. Rosenblatt; Ray
Morse Sanderson; Claire Tillman; Warren G. Vander Voort;
Peter Beck; Harold Franz Ilg; John C. Griffin; Ted
Kosloff; Francis J. Milon; Glen R. Mogan; Melanie M.
Norton; Joseph F. Weller, Plaintiffs-Appellants,
v.
LLOYD'S OF LONDON, an unincorporated association;
Corporation Of Lloyd's, aka Society of Lloyd's,
aka The Society and Council of Lloyd's,
Defendants-Appellees.
 Nos. 95-55747, 95-56467.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 5, 1996.
Decided March 6, 1997.
 
 Stephen A. Kroft, McDermott, Will & Emery, Los Angeles, California; Eugene I. Goldman, Robert E. Kohn, McDermott, Will & Emery, Washington, D.C.; Arlington Ray Robbins, Michael V. Pundeff, John H. Stephens, Robbins & Keehn, San Diego, California, for plaintiffs-appellants.
 Phillip K. Fife, Seal Beach, California, for plaintiff-appellant E. Pomeroy Williams.
 Dean Hansell, LeBoeuf, Lamb, Greene & MacRae, Los Angeles, California, Taylor R. Briggs, Sheila H. Marshall, Mary L.B. Betts, Stephen H. Orel, LeBoeuf, Lamb, Greene & MacRae, New York, New York, for defendants-appellees The Corporation of Lloyd's, the Society of Lloyd's, and The Council of Lloyd's.
 Richard H. Walker, Jacob H. Stillman, Eric Summergrad, John W. Avery, Securities and Exchange Commission, Washington, D.C., as amicus curiae.
 Eugene R. Anderson, Seth B. Schafler, Anderson Kill Olick & Oshinsky, New York, New York; Amy R. Bach, San Francisco, California, for amicus curiae United Policy holders.
 Richard A. Brown, Leonard D. Venger, Ronald B. Turovsky, Donald R. Brown, Manatt, Phelps & Phillips, Los Angeles, California; Paul H. Falon, Manatt, Phelps & Phillips, Washington, D.C., William W. Palmer, General Counsel, California Department of Insurance, for amicus curiae California Commissioner of Insurance.
 Appeals from the United States District Court for the Southern District of California, Irma E. Gonzalez, District Judge, Presiding. D.C. Nos. CV-94-01211-IEG, CV-95-00952-IEG.
 Before: GOODWIN, WIGGINS and NOONAN, Circuit Judges.
 NOONAN, Circuit Judge.
 
 
 1
 Alan Richards and 573 other individuals (collectively, the plaintiffs or the Names) brought suit against the Corporation of Lloyd's (Lloyd's) and against Lloyd's of London, a community of enterprises characterized by the plaintiffs as an Unincorporated Association (the Unincorporated Association). The plaintiffs alleged securities fraud under the Securities Act of 1933, 15 U.S.C. § 77a (the 1933 Act) and under the Securities Exchange Act of 1934, 15 U.S.C. § 78a (the 1934 Act). The suit also alleged related violations of the Racketeer Influenced and Corrupt Organizations Act of 1970, 18 U.S.C. § 1961 et seq. (RICO). The plaintiffs further alleged breach of state Blue Sky laws, breach of fiduciary duty, and common law fraud. On motion of the defendants under Fed.R.Civ.P. 12(b)(3) the district court dismissed the plaintiffs' action.
 
 
 2
 The primary question presented on appeal is whether forum selection and choice of law provisions in the contracts signed by the Names (the Choice Clauses) require the application of English law to the plaintiffs' claims and the confinement of these claims to the courts of England. Holding that the Choice Clauses are void because they violate the 1933 Act and the 1934 Act, we reverse the district court's dismissal of the Names' federal claims. We affirm the district court's dismissal of the claims under the Blue Sky laws and the common law claims. We remand for consideration by the district court the amenability to suit of the Unincorporated Association.
 
 
 3
 Without passing on the truth of the allegations, we set out the plaintiffs' case as it is alleged by them.
 
 THE ALLEGATIONS
 
 4
 The Unincorporated Association is engaged in the business of writing insurance and reinsurance. Its principal place of business is London, England. Its principal parts consist of the corporation (Lloyd's, the other defendant in this case); underwriting agents; brokers; and syndicates of underwriters. The corporation, Lloyd's, is governed by the Council for Lloyd's; the Council has "virtually complete control" over all of the operations of Lloyd's, including the operations of the underwriting agents and the brokers, and "virtually dictates the exact form of agreements and contents of agreements that are to be used ... and dictates not only the policies but the practices of those who constitute the Lloyd's community."
 
 
 5
 The members of each syndicate underwriting insurance are known as Names. They are divided into Working Names, a group of insiders who devote essentially full time to the business of insurance at Lloyd's, and External Names, recruited from all over the world. The Working Names control Lloyd's. The External Names are "totally passive investors" and "are absolutely prohibited" from being involved in the "underwriting process." They make a deposit, usually in the form of a letter of credit, equal to a percentage of the premium income they expect to receive in a given year from the underwriting syndicate of which they are members. They have several, not joint, liability on the policies written by the syndicate. The liability of each Name is unlimited.
 
 
 6
 Between 1970 and 1993 Lloyd's sought to increase its underwriting capacity and to do so undertook "a major recruitment program in the United States." Representatives of Lloyd's came to the United States to carry out the recruitment by offering investment contracts by which residents of the United States might become External Names at Lloyd's. Lloyd's provided printed information on its history and operations as part of the campaign. The United States mails were used to provide this information and to send questionnaires, applications, and agreements to potential Names resident in the United States. Brokerage firms in the United States were paid commissions by Lloyd's to recruit Names in this country. Existing Names in the United States were also given financial incentives to recruit additional Names here. The information furnished by Lloyd's did not meet the standards required of prospectuses by the Securities Exchange Commission (the SEC). The investment contracts offered by Lloyd's were securities but were not registered under either federal or state law.
 
 
 7
 As a result of its efforts, Lloyd's raised over $600 million in letters of credit and deposits furnished by residents of the United States who became External Names. Lloyd's also enormously expanded its underwriting capacity by securing the unlimited liability on insurance contracts from Lloyd's of 3,196 residents of the United States recruited to become External Names at Lloyd's. The plaintiffs are a portion of those so recruited.
 
 
 8
 Plaintiffs, the Names of this case, were defrauded by Lloyd's in at least one of two ways: (1) Lloyd's put them on syndicates reinsuring long tail asbestos and toxic waste claims which had arisen prior to these Names becoming members of such syndicates; (2) Lloyd's put them on syndicates carrying an unusual concentration of risks because of a reinsurance scheme (the LMX Spiral) that operated as a species of scam. In neither case did Lloyd's inform the plaintiffs of the magnitude of their exposure although Lloyd's was aware of the magnitude. In each case Lloyd's acted to benefit Working Members and other insiders at Lloyd's while pushing large liabilities foreseen by Lloyd's, but undisclosed by it, upon the unsuspecting and uninformed External Names of whom the plaintiffs form a portion.
 
 
 9
 In 1986, these plaintiffs each were required by Lloyd's to execute in the United States a contract with Lloyd's entitled "General Undertaking." Paragraph 2.1 of this agreement reads as follows: "The rights and obligations of the parties arising out of or relating to the Member's membership of, and/or underwriting of insurance business at, Lloyd's and any other matter referred to in this Undertaking, shall be governed by and construed in accordance with the laws of England." Paragraph 2.2 of this agreement reads in relevant part as follows: "Each party irrevocably agrees that the courts of England shall have exclusive jurisdiction to settle any dispute and/or controversy of whatsoever nature arising out of or relating to the Member's membership of, and/or underwriting of insurance business at Lloyd's...." These two provisions, the Choice Clauses, had not been in General Undertakings prior to 1986 but that group of plaintiffs who had become Names prior to 1986 and signed earlier General Undertakings without the Choice Clauses were required by Lloyd's to execute the 1986 form as a condition of remaining as Names. The group of plaintiffs who became Names in 1986 and thereafter were required by Lloyd's to execute the 1986 form as a condition of becoming Names. To neither group of plaintiffs did Lloyd's disclose the information it possessed as to the fraud or frauds being practised on them. The Choice Clauses were themselves obtained by fraud.
 
 
 10
 Such are the plaintiffs' allegations.
 
 PROCEEDINGS
 
 11
 On October 9, 1994 the plaintiffs filed in the Southern District of California an amended complaint containing these allegations. The Unincorporated Association did not answer, and the plaintiffs moved for a default judgment against it. Invoking the Choice Clauses, Lloyd's moved to dismiss on the grounds of improper venue, also on grounds of forum non conveniens and/or res judicata. Various declarations were submitted by both sides as well as pleadings and judgments in other cases. In argument, Lloyd's relied on the Choice Clauses and forum non conveniens.
 
 
 12
 On April 28, 1995 the district court entered its order dismissing the complaint. "Forum-selection clauses," the court reasoned, "are presumptively valid," to be set aside only if "unreasonable" under the circumstances. Such circumstances, the court found, had not been shown here. Relying on Roby v. Corporation of Lloyd's, 996 F.2d 1353 (2d Cir.), cert. denied, 510 U.S. 945, 114 S.Ct. 385, 126 L.Ed.2d 333 (1993), the court held that the remedies available in England were sufficient to protect the American investors. Refining the Second Circuit's reasoning in Roby, the court noted that the SEC's inaction towards Lloyd's "undercuts or dilutes the strength of the policy argument that insufficient deterrence exists for Lloyd's" under the laws of England. The court found insufficient evidence to support the allegation that the Choice Clauses themselves were obtained by fraud.
 
 
 13
 The plaintiffs moved for reconsideration. On August 4, 1995 the district court denied this motion, adding: "The Dismissal Order dismissed plaintiffs' complaint in its entirety and as to all parties. Therefore the court dismisses as moot" plaintiffs' motion for a default judgment against the Unincorporated Association.
 
 
 14
 The plaintiffs appeal.
 
 ANALYSIS
 
 15
 The validity of the Choice Clauses is first attacked by the plaintiffs on the ground that these clauses were themselves procured by fraud. On this point as it affects the jurisdiction of the district court, the allegations of the plaintiffs are not to be taken as true, as would be the rule in an ordinary motion to dismiss under Rule 12. To the contrary, we have held that such clauses are good, "[a]bsent some evidence submitted by the party opposing enforcement of the clause to establish fraud, undue influence, overweening bargaining power, or such serious inconvenience in litigating in the selected forum so as to deprive the party of a meaningful day in court...." Argueta v. Banco Mexicano, 87 F.3d 320, 324 (9th Cir.1996) (italics in original) (quoting Pelleport Investors, Inc. v. Budco Quality Theatres, Inc., 741 F.2d 273, 280 (9th Cir.1984)). The district court here found that the plaintiff had not produced sufficient evidence of fraud in the procurement of the Choice Clauses. We defer to this factual finding. For purposes of defeating the Rule 12(b)(3) motion and for purposes of this appeal (but not as the law of the case because the plaintiffs have not had the chance to present their full case), the Choice Clauses must be deemed not obtained by fraud.
 
 
 16
 We express no view on whether the Names' participation in Lloyd's constitutes the purchase of a "security" within the meaning of the Securities Act of 1933 and the Securities Exchange Act of 1934. For purposes of this appeal, we assume the truth of the Names' allegation that Lloyd's was engaged in the offer and sale of securities. Determining whether the Names can prove this allegation will require further development of the record in the district court at trial or on summary judgment.
 
 
 17
 We turn to the validity of these clauses under the controlling statutes. Doing so, we take the plaintiffs' allegations as to their causes of action to be true. We look not at evidence--for the plaintiffs do not have to prove their case at the pleading stage--but at what the plaintiffs say their case is.
 
 
 18
 The Statutes' Bar. Section 14 of the 1933 Act provides:
 
 
 19
 Any condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision of this title or of the rules and regulations of the Commission [the SEC] shall be void.
 
 
 20
 15 U.S.C. § 77n. The bar of Section 29a of the 1934 Act is substantially the same. 15 U.S.C. § 78cc(a). The Choice Clauses operate to effect such waivers. Accordingly, under the precise terms of these two statutes, the Choice Clauses are void.
 
 
 21
 The district court made an error of law in supposing that the Choice Clauses were unenforceable only if unreasonable. Congress had already determined that such clauses were void. It was not for a court to weigh their reasonableness, not for a court to say whether they offended any policy of the United States. The policy decision had been made by the legislature.
 
 
 22
 Lloyd's asks us to look at Scherk v. Alberto-Culver Co., 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974) where the Supreme Court, 5-4, held that in "an international commercial transaction" the parties' agreement to arbitrate before the International Chamber of Commerce in Paris any controversy or claim that "shall arise out of this agreement" should be upheld despite the plaintiffs' reliance on § 10b of the 1934 Act. Lloyd's overlooks both the facts and the reasoning of this precedent. As to the facts: the property being purchased was that of three businesses organized under the laws of Germany and Liechtenstein. Negotiations for the contract took place in the United States, England and Germany and involved consultations with legal and trademark experts from these countries and from Liechtenstein. The contract was signed in Austria. The businesses being bought were engaged in activities, "largely if not entirely, directed to European markets." Id. at 515, 94 S.Ct. at 2455.
 
 
 23
 As to the reasoning: the Supreme Court stressed "the orderliness and predictability essential to any international business transaction" and the dangers presented by a "parochial refusal" to "enforce an international arbitration agreement." Id. at 516, 94 S.Ct. at 2456. The Supreme Court quoted with approval from The Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 9, 92 S.Ct. 1907, 1912-13, 32 L.Ed.2d 513 (1972): "We cannot have trade and commerce in world markets and international waters exclusively on our terms, governed by our laws, and resolved in our courts." The Supreme Court said that for these reasons it held "that the provisions of the Arbitration Act cannot be ignored in this case." Scherk, 417 U.S. at 513, 94 S.Ct. at 2454. The Supreme Court relied on this act of Congress, 9 U.S.C. § 1, which it found to represent a policy not easily reconcilable with the Securities Exchange Act. Id. at 512, 94 S.Ct. at 2453-54 (referring to the Court's earlier statement in Wilko v. Swan, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953)). With two federal statutes in conflict, the considerations of international commerce tipped the balance. An exception to "the clear provisions of the Arbitration Act" would not be accepted. Scherk, 417 U.S at 517, 94 S.Ct. at 2456.
 
 
 24
 The fragmentary contacts with the United States of the contract in Scherk distinguish that contract from the contracts here where, according to the allegations we must accept at this state of the pleadings as true, the offerees were recruited in the United States, agents of the offeror were paid in the United States, documents material to the contracts were mailed in the United States and executed in the United States, and residents of the United States invested large sums of money and remained liable to the full extent of their assets for indefinite amounts of money. Factually distinct from Scherk, the case is also distinct in terms of the statutes involved. As is apparent from the Supreme Court's reasoning, the Court in Scherk had to decide which one of two federal statutes to apply. It chose to apply the Arbitration Act. It did not weigh reasonableness or pit amorphous policy against a command of Congress.
 
 
 25
 Is there a significant difference between a policy objection to enforcement of the antiwaiver bars and a statutory obstacle to such enforcement? We believe there is. Where a statute exists, a policy has been given form and focus and precise force. A statute represents a decision by the elected representatives of the people as to what particular policy should prevail, and how. A policy objection represents judicial reasoning in the area where the federal statutes, if they are to the contrary, must rule. A statutory obstacle represents a legislative determination that is of at least equal weight with another statute. Consequently, what was decided when the Arbitration Act stood in the way of the antiwaiver bars is not helpful when no statute stands in the way of their enforcement.
 
 
 26
 The Supreme Court in Mitsubishi Motors v. Soler Chrysler-Plymouth, 473 U.S. 614, 637 n. 19, 105 S.Ct. 3346, 3359 n. 19 (1985) has already declared in dicta in an antitrust case what it thinks of contract clauses operating in an international transaction, as the Choice Clauses do here, contrary to the statutes of the United States: "We merely note that in the event the choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations, we would have little hesitation in condemning the agreement as against public policy." There is no question that the Choice Clauses operate in tandem as a prospective waiver of the plaintiffs' remedies under the 1933 and 1934 Acts. If the Supreme Court would condemn such clauses where they work against a public policy embodied in statutes even though the statutes themselves do not void the clauses, a fortiori the Supreme Court would condemn similar clauses when they run in the teeth of two precise statutory provisions making them void.
 
 
 27
 There is an additional reason why application of the Choice Clauses is barred by precedent that explicitly refers to the statutory bars of the 1933 and 1934 Acts: In securities cases upholding arbitration clauses by virtue of the Arbitration Act, the Supreme Court has observed that arbitration changes procedure but that the arbitrators will apply the substantive securities law of the United States where that law is applicable. Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 481, 109 S.Ct. 1917, 1920, 104 L.Ed.2d 526 (1989); Shearson/American Express v. McMahon, 482 U.S. 220, 232, 107 S.Ct. 2332, 2340-41, 96 L.Ed.2d 185 (1987). In Scherk because of the slight contacts with the United States the proper law to be applied was uncertain and so could be fixed by agreement. See Scherk, 417 U.S. at 516, 94 S.Ct. at 2455-56. The strong implication is that where there is substantial contact with the United States even the Arbitration Act could not authorize the waiver of the substantive protections of the 1933 and 1934 Acts. What the Supreme Court has in mind by "substantive" provisions of these Acts is illustrated by "the provision in section 12(2) of the 1933 Act placing on the seller the burden of proving lack of scienter when a buyer alleges fraud." Rodriguez de Quijas, 490 U.S. at 481, 109 S.Ct. at 1920. By this test, the Choice Clauses require the waiver of substantive provisions of the 1933 and 1934 Acts and are consequently void.
 
 
 28
 Lloyd's urges not as controlling but persuasive precedent the decision of other circuits in cases pursued by certain Names against Lloyd's. The first of these, Riley v. Kingsley Underwriting Agencies, Ltd., 969 F.2d 953 (10th Cir.1992), cert. denied, 506 U.S. 1021, 113 S.Ct. 658, 121 L.Ed.2d 584 (1992) is a federal securities case against Lloyd's where the court did not discuss the statutory bars and where the issue was clouded by the presence of a clause requiring arbitration. It is not an apt precedent here.
 
 
 29
 We recognize that our holding creates a conflict with the interpretation of the Lloyd's Choice Clauses in other cases. E.g., Allen v. Lloyd's of London, 94 F.3d 923 (4th Cir.1996); Bonny v. Society of Lloyd's, 3 F.3d 156 (7th Cir.1993), cert. denied, 510 U.S. 1113, 114 S.Ct. 1057, 127 L.Ed.2d 378 (1994); and Roby v. Corporation of Lloyd's, 996 F.2d 1353 (2d Cir.), cert. denied, 510 U.S. 945, 114 S.Ct. 385, 126 L.Ed.2d 333 (1993). Although we do not lightly deviate from the conclusions of our fellow circuits, we are convinced that those cases improperly disregard the statutory antiwaiver provisions of the Securities Acts. A comprehensive review of these cases has recently come to the same critical conclusion. Darrell Hall, Note, No Way Out: An Argument Against Permitting Parties to Opt Out of U.S. Securities Law In International Transactions, 97 Colum.L.Rev., 57, 74-78 (1997).
 
 
 30
 These other circuit courts examined whether the Choice Clauses are enforceable by applying an analysis announced in The Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972). The Bremen held that choice-of-forum clauses should be enforced against a party unless it could show that enforcement would be unreasonable or unjust, or that the clause was invalid due to fraud or overreaching. Id. at 15, 92 S.Ct. at 1916. These other circuit courts interpreted The Bremen and Carnival Cruise Lines, Inc. v. Shute, 499 U.S. 585, 595, 111 S.Ct. 1522, 1528, 113 L.Ed.2d 622 (1991), as setting forth a "reasonableness" test to evaluate choice-of-forum clauses. Allen, 94 F.3d at 928; Bonny, 3 F.3d at 160; Roby, 996 F.2d at 1363. One factor making a clause "unreasonable," and hence unenforceable, is if enforcement of the clause would contravene a strong public policy of the forum state. Allen, 94 F.3d at 928; Bonny, 3 F.3d at 160; Roby, 996 F.2d at 1363. In The Bremen, the Supreme Court stated that "[a] contractual choice-of-forum clause should be held unenforceable if enforcement would contravene a strong public policy of the forum in which suit is brought, whether declared by statute or by judicial decision." Bremen, 407 U.S. at 15, 92 S.Ct. at 1916.
 
 
 31
 Applying this test, these other circuits have determined that the American securities laws do not prevent application of the Choice Clauses. Deciding that the remedies available under English law are adequate to effectuate the anti-fraud purposes of the American securities laws, these circuit courts concluded that the Choice Clauses were reasonable and should be enforced.
 
 
 32
 For instance, as posed by the Seventh Circuit in Bonny, "the fundamental question" became whether the remedies available in England subverted "the public policy" of the Acts. Bonny, 3 F.3d at 161. The court found that the plaintiffs could sue Lloyd's in England for fraud and for breach of contract; that they could sue Member's Agents for breach of fiduciary duty; that upon application of [an English] Secretary of State they might obtain an injunction and remedial orders; and that, upon a finding of criminal liability under the [English] Financial Services Act, they "could potentially receive some compensation for their injuries. More importantly, such criminal penalties serve as an important deterrent against exploitation of United States investors." Id. In our view, however, the reasonableness of the Choice Clauses is not determinative of their enforceability. The Securities Acts' antiwaiver provisions themselves render the Choice Clauses void, making it unnecessary to examine whether enforcement of the clauses would be reasonable under the test set forth in The Bremen and Carnival. Notably, The Bremen did not involve the applicability of a statutory anti-waiver provision like that contained in the Securities Acts. The Supreme Court was reviewing a judgment of the Fifth Circuit holding that this choice-of-forum clause contained in an international admiralty contract was unenforceable because it was contrary to public policy.
 
 
 33
 Reading The Bremen closely dispels the notion that choice-of-forum clauses are generally disfavored. The Bremen, 407 U.S. at 10, 92 S.Ct. at 1913. Instead, those clauses are presumed valid, though the "reasonableness" test allows the presumption to be rebutted. Id. However, The Bremen did not apply the "reasonableness" analysis in the face of a statute purporting to decide the question of a choice-of-forum clause's enforceability. The Bremen announced a reasonableness test to evaluate choice-of-forum clauses when Congress has not directly spoken to the issue. The "unreasonableness" test does not apply here where Congress specifically enacted antiwaiver provisions in the Securities Acts.
 
 
 34
 Further support of this conclusion is found in the Supreme Court's Carnival decision, specifically in its discussion of the effect of the Limitation of Vessel Owner's Liability Act, 46 U.S.C.App. § 183c. The Carnival Court does not apply The Bremen 's "reasonableness" analysis to determine whether this statute renders unenforceable a choice-of-forum clause contained in a contract between a cruise ship and a passenger. The Court discusses The Bremen analysis separately, concluding that the forum-selection clause is not unreasonable under The Bremen factors. When analyzing section 183c, however, the Court simply rules that the forum-selection clause did not violate the statute. Carnival, 499 U.S. at 596, 111 S.Ct. at 1528-29.
 
 
 35
 Congress was not ignorant of the potential international character of securities transactions. Congress specifically modified the 1933 Act to cover transactions in foreign commerce. S.Rep. No. 47, 73d Cong., 1st Sess. (1933) (accompanying S. 875.) A court should not apply the reasonableness test or say whether the clauses offended any policy of the United States when Congress has expressly made that determination. We do not believe that we should turn the clock back to 1929 or introduce caveat emptor as the rule governing the solicitation in the United States of investments in securities by residents of the United States. See Jennifer M. Eck, Note, "Turning Back The Clock: A Judicial Return to Caveat Emptor For U.S. Investors In Foreign Markets", 19 N.C.J. Int'l L. & Com.Reg. 313 (1994).
 
 
 36
 The dissent makes several remarkable rhetorical points: (1) Our decision means that Americans betting on chicken fights in Zamboanga could sue for breach of American securities law. (2) Our decision subjects Lloyd's "to the varying requirements of the different countries in which the Names might reside." (3) It is "unlikely" that, without the Choice Clauses, Lloyd's would engage in underwriting risks at reasonable premiums. More dispassionate conclusions would be that Americans can sue over a foreign gaming venture only if its securities are peddled in the United States; subjecting sales of Lloyd's securities to our securities laws says nothing at all as to the legal fate of Lloyd's in the rest of the world; and Lloyd's will go on writing insurance as long as the business is profitable, Lloyd's will merely be more circumspect in raising capital in the United States. The fundamental issue dividing the majority and minority does not depend upon rhetorical flourishes but on whether the courts or Congress determines our national policy after Congress has spoken.
 
 
 37
 Even undertaking the analysis that the other circuits undertook, we cannot agree with their evaluation of the remedies available. In this not easy task we are aided by the SEC, which has entered this case on appeal as a friend of the court. We do not defer to its position as one arrived at by agency rulemaking (which has not occurred), but we do draw on the SEC's expertise when it points to the deficiencies in the remedies provided the plaintiffs by English law. Three major deficiencies exist: (1) There is no remedy in England for failure to register securities as required by Section 12(1) of the 1933 Act. (2) There is no remedy in England against Lloyd's for negligent misrepresentation as provided by Section 12(2); the Lloyd's Act, 1982, expressly immunizes Lloyd's from any claim "for negligence or other tort, breach of duty or otherwise ... unless the act or omission complained of ... was done or omitted to be done in bad faith." (3) In the United States there is liability for controlling persons under Section 15 of the 1933 Act and Section 20(a) of the 1934 Act; there is no such liability in England. We need not go further to list the various procedural and financial requirements noted by the plaintiffs which would act as hurdles to obtaining relief in England. Major gaps exist in the English substantive law of securities fraud. The available English remedies are not adequate substitutes for the firm shields and finely honed swords provided by American securities law.
 
 
 38
 The dissent believes a "plain, speedy and adequate remedy" exists if the plaintiffs had sued other defendants, some of whom the dissent acknowledges to be insolvent. Such hypothetical and derisory possibilities are not alternative remedies at all so far as concerns the defendants the plaintiffs did choose to sue. The dissent goes on to disparage suit in a federal court as a suit in California, a "plaintiff-friendly environment." The dissent takes no equivalent glance at the environment likely to surround American investors seeking redress in London against Lloyd's of London, a business corporation so powerful that it has obtained from the British legislature substantial immunities. A plain, speedy, and adequate remedy for the wrongs alleged by the plaintiffs is not shown to exist in Britain.
 
 
 39
 The RICO Claims. The plaintiffs' Tenth Claim for Relief, for alleged violations of RICO, rests in part on allegations of "multiple acts of fraud in the sale of securities" in violation of the 1933 and 1934 Acts and in part on allegations of mail fraud in violation of 18 U.S.C. §§ 1341 and 1343. The allegations of securities fraud tie the RICO allegations to the federal securities claims but the bar on the waiver of rights under the Securities Acts is not a bar of waiver of rights under RICO, so our analysis of the Securities Act is not controlling. At the same time the record is bare as to what remedy an English court would provide a RICO claim. Consequently, we remand to the district court to determine in the light of this opinion whether the Choice Clauses are reasonable in their impact on the obligations established by RICO.
 
 
 40
 Forum non conveniens. Lloyd's asks us to affirm on the basis of forum non conveniens as a ground apparent on the record although not a ground adopted by the district court. We decline to do so. Dismissal for forum non conveniens requires a balancing of a multitude of factors first properly found and weighed by the district court. We do note the heavy burden to be sustained by the defendants in the light of our holding that Lloyd's by contract cannot avoid application of the federal securities statutes.
 
 
 41
 The Blue Sky Claims. The Blue Sky Law claims are pleaded perfunctorily and without reference to any particular state law prohibitions against the Choice Clauses. For the reasons stated by the several circuit courts that have upheld the Choice Clauses, we hold that they bind the parties in the absence of any statutory provision annulling them.
 
 
 42
 The Common Law Fraud And Breach Of Fiduciary Duty Claims. These claims, too, must be pursued according to the Choice Clauses. No statute of the United States is to the contrary. The English remedies appear adequate.
 
 
 43
 The Status Of The Unincorporated Association. Fed.R.Civ.P. 17(b) provides:
 
 
 44
 The capacity of a corporation to sue or be sued shall be determined by the law under which it was organized. In all other cases capacity to sue or be sued shall be determined by the law of the state in which the district court is held, except (1) that a partnership or other unincorporated association, which has no such capacity by the law of such state, may sue or be sued in its common name for the purpose of enforcing for or against it a substantive right existing under the Constitution or laws of the United States.
 
 
 45
 See, e.g., Sierra Ass'n v. FERC, 744 F.2d 661, 662 (9th Cir.1984).
 
 
 46
 The district court did not rule on the plaintiffs' motion to grant a default against the Unincorporated Association, which did not answer the plaintiffs' complaint. On remand, the district court should rule on the motion in the light of Rule 17(b) and in the light of such facts as the district court finds after a hearing.
 
 CONCLUSION
 
 47
 For the reasons stated, the judgment of the district court is AFFIRMED in its dismissal of the Blue Sky law, common law fraud, and breach of fiduciary duty claims. The judgment of the district court is REVERSED as to its dismissal of the federal securities and RICO claims and the dismissal of the plaintiffs' default motion against the Unincorporated Association. The case is REMANDED to the district court.
 
 
 48
 GOODWIN, Circuit Judge, Concurring and Dissenting:
 
 
 49
 I would affirm the judgment dismissing the action pursuant to Fed.R.Civ.P. 12(b)(3). The Choice Clauses are valid and are not preempted by extraterritorial application of the United States securities laws.
 
 
 50
 Appellants, all citizens or residents of the United States, claim that Section 14 of the 1933 Act and Section 29a of the 1934 Act, give them the right to repudiate their insuring agreements. Section 14 reads:
 
 
 51
 Any condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision of this subchapter or of the rules and regulations of the Commission shall be void.
 
 
 52
 The key question is whether the transactions described in the complaint made the appellants "persons acquiring any security." The majority concludes, without deciding whether these foreign insurance undertakings are securities, that the appellants have brought themselves within the protection of a law designed to protect domestic investors from being victimized by combinations of their own greed and the artifices of sellers of investment schemes. The majority holds that just because the Appellants alleged in their complaint that they were "persons acquiring any security," United States securities law renders void the carefully written terms of the engagements by which the Appellants brought themselves into the English insurance underwriting scheme popularly known as "Lloyd's of London."
 
 
 53
 The same reasoning would bring protections under our securities laws to any one who loses his or her savings betting on chicken fights in Zamboanga. An American could simply allege she had purchased a security, and thus repudiate any contractual obligations entered into around the world. There must be some limit to the reach of the United States government as nanny.
 
 
 54
 There are a number of prudential reasons, based on the augmentation of trade, as well as domestic legal reasons, based upon United States precedent, why the majority's willingness to jettison solemn international contracts in order to pursue a perceived policy goal on the part of Congress must be called into question.
 
 
 55
 I accept, as one must for Rule 12(b)(3) purposes when examining pleadings, the majority's statement of the facts. But the facts as pled do not compel the majority's conclusions of law.
 
 
 56
 United States residents, having heard of the profits to be made and the risks to be run by investing in the worldwide underwriting pools in the peculiar form of risk insurance popularly known as Lloyd's of London, wanted to become "Names" (hereinafter referred to as Names). They ventured their assets, as all Names must, and those who lost money sued. Those who did not lose money apparently have not sued, but may be waiting in the wings to see how this case comes out and to sue if they ever do lose money. It is precisely this effect on the worldwide insurance business, and upon other international contracts, that makes this case strange, and troubling.
 
 
 57
 The Appellants did not sue in the courts of the United Kingdom, which they solemnly agreed to do if they deemed themselves wronged. Instead, they sought out the courts of this circuit, and repudiated that part of their agreement with the defendants which the Appellants found inconvenient to their litigation strategy.
 
 
 58
 It appears from their complaint, and reference to English law, that if Appellants can prove their essential facts, English law would provide a plain, speedy, and adequate remedy for any fraud that was practiced upon them, and fraud is what they now say made their bargain improvident.
 
 
 59
 The majority virtually ignores the contracts the parties negotiated and executed, contractual undertakings without which their opportunity to venture their assets would not have been open. The majority also ignores the century of historic success the nation's insurance lobby has enjoyed in keeping federal law largely out of the insurance business. It assumes that because the Appellants claimed they had acquired securities, the securities laws trumped all other law that might bear upon the subject at hand.
 
 
 60
 The implications of this holding on international business transactions are not likely to lubricate commerce. Therefore, I would follow the other circuits that have enforced the Names' obligations to litigate their claims in the English courts. See Roby v. Corporation of Lloyd's, 996 F.2d 1353 (2d Cir.), cert. denied, 510 U.S. 945, 114 S.Ct. 385, 126 L.Ed.2d 333 (1993); Bonny v. Society of Lloyd's, 3 F.3d 156 (7th Cir.1993), cert. denied, 510 U.S. 1113, 114 S.Ct. 1057, 127 L.Ed.2d 378 (1994); Riley v. Kingsley Underwriting Agencies, Ltd., 969 F.2d 953 (10th Cir.), cert. denied, 506 U.S. 1021, 113 S.Ct. 658, 121 L.Ed.2d 584 (1992); Shell v. R.W. Sturge, Ltd., 55 F.3d 1227 (6th Cir.1995); Allen v. Lloyd's of London, 94 F.3d 923 (4th Cir.1996).
 
 I. International v. Domestic
 
 61
 The Supreme Court indicated in The Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 15, 92 S.Ct. 1907, 1916, 32 L.Ed.2d 513 (1972) that forum selection clauses are presumptively valid where the underlying transaction is fundamentally international in character. This presumption also holds for actions under the securities acts. See Scherk v. Alberto-Culver Co., 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974). The majority seeks to weaken Scherk by treating the dispute in this case as basically domestic. While Appellants allege that they were solicited in the United States and many Appellants signed the General Undertaking in the United States, international traders sign documents every day and transmit signatures electronically overseas with the locus of the signing a wholly immaterial historical fact. Signing a document in a ski lodge in Austria does not bring Austrian law to bear upon all future disputes arising out of the document. These arguments rehearse the usual "points of contact" aggregation that occurs in interstate litigation within the United States when competing state laws are invoked by the parties and the court must choose the law to apply in a diversity case. This is a diversity case, but it is not a points of contacts case. The case is about international commerce.
 
 
 62
 Appellants also argue that the ROTA Committee meeting in England that all Names must attend is simply a formality that should not have presumptive weight in determining whether to characterize these transactions as international. Becoming a Name is not a matter of empty formality. The ROTA Committee meeting is an essential part of becoming a Member.
 
 
 63
 Whether solicited in California or in Hong Kong, the Names freely and voluntarily contracted to become members of an English insurance marketplace that underwrites insurance worldwide.[1] Subjecting Lloyd's to the varying requirements of the different countries in which Names might reside would inject counterproductive uncertainty into the operation of the Lloyd's marketplace. Such uncertainty interferes with the smooth functioning and growth of global commerce, see Bremen, 407 U.S. at 9, 92 S.Ct. at 1912-13, and destroys the predictability needed for financial planning and for the resolution of disputes. See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 629, 105 S.Ct. 3346, 3355, 87 L.Ed.2d 444 (1985).
 
 
 64
 Lloyd's structured its system to avoid this uncertainty and to create predictability through use of forum selection and choice-of-law clauses. See Scherk, 417 U.S. at 518, 94 S.Ct. at 2456-57; Roby, 996 F.2d at 1363. Further, international comity dictates that United States courts enforce choice-of-forum clauses out of respect for the integrity and competence of foreign tribunals. See Mitsubishi, 473 U.S. at 629, 105 S.Ct. at 3355. Finally, our failure to enforce the Choice Clauses could lead to "unseemly and mutually destructive jockeying by the parties to secure tactical litigation advantages." Scherk, 417 U.S. at 516-17, 94 S.Ct. at 2455-56. If Lloyd's "had anticipated that [Appellants] would be able in this country to enjoin [enforcement of the forum selection clause, Lloyd's] might have sought an order in [England] enjoining [Appellants] from proceeding with [their] litigation in the United States." See id. at 517, 94 S.Ct. at 2456. In any event, without the certainty of the Choice Clauses, it is unlikely that Lloyd's would engage to underwrite, at premiums anyone would pay, the kind of risks in the various venues of the earth in which losses could occur.
 
 
 65
 II. Are the Choice Clauses Unreasonable Under the Circumstances?
 
 
 66
 The presumption in favor of choice-of-forum clauses in international transactions can be overcome by a clear showing that the clauses are "unreasonable under the circumstances." Bremen, 407 U.S. at 10, 92 S.Ct. at 1913. Forum selection clauses are unreasonable (1) if their incorporation into the agreement was the result of fraud or overreaching, Bremen, 407 U.S. at 12-13, 92 S.Ct. at 1914-15; (2) if the complaining party "will for all practical purposes be deprived of his day in court," due to the grave inconvenience or unfairness of the selected forum, id. at 18, 92 S.Ct. at 1917-18; (3) if the fundamental unfairness of the chosen forum may deprive the plaintiff of a remedy, Roby, 996 F.2d at 1363; or (4) if the clauses contravene a strong public policy of the forum state, Bremen 407 U.S. at 15, 92 S.Ct. at 1916.
 
 A. The Antiwaiver Provisions
 
 67
 In international agreements, the Supreme Court has enforced choice clauses even where similar agreements in purely domestic transactions might not be recognized. Still, the majority holds that the antiwaiver provisions and the securities laws embody a public policy offended by the Choice Clauses. However, none of the other courts of appeals that have addressed the enforceability of the Choice Clauses in the General Undertaking have failed to enforce the forum selection clause.[2] See Roby, 996 F.2d 1353; Bonny, 3 F.3d 156; Riley, 969 F.2d 953; Shell, 55 F.3d 1227; Allen, 94 F.3d 923. But see Leslie v. Lloyd's of London, Civ.A. No. H-90-1907, 1995 WL 661090 (Aug. 20, 1995 S.D.Tex.).
 
 
 68
 It is true that none of the cited cases specifically addressed Appellants' contention, and the majority's holding, that the antiwaiver provisions explicitly prohibit the enforcement of the clauses. Rather, the courts engaged in judicial balancing to determine whether enforcement of the clauses would contravene the strong public policy embodied in the antiwaiver provisions. Judicial balancing is the appropriate course.
 
 
 69
 The other courts of appeals, citing Bremen, have implicitly crafted an exception to the antiwaiver provisions in international agreements where the remedies available in the selected forum are sufficient to "deter issuers from exploiting American investors." Roby, 996 F.2d at 1364; see Bonny, 3 F.3d at 161 (holding that so long as "remedies available in the selected forum [do not] subvert the public policy" of the securities laws the court will enforce the clauses). In Bremen, the Supreme Court enforced a choice-of-forum clause even though the English courts would give effect to an exculpatory clause in the contract that United States courts would not if the case arose in a domestic setting. Bremen, 407 U.S. at 15-16, 92 S.Ct. at 1916-17. The Court held that the "considerations with respect to the towage business strictly in American waters ... are not controlling in an international commercial agreement." Id. Further, the Court quoted the dissent in the court of appeals stating that "we should not invalidate the forum selection clause here unless we are firmly convinced that we would hereby significantly encourage negligent conduct within the boundaries of the United States." Id. at 16, 92 S.Ct. at 1916. Similarly here, we should not invalidate the Choice Clauses unless we are firmly convinced that England does not provide adequate remedies to deter fraud upon United States Names.
 
 
 70
 The majority disregards Bremen because it did not involve a federal statute but rather federal admiralty law. Bremen, however, does not rely on distinctions between statutory and judge made law. The Bremen Court stated that "[a] contractual choice-of-forum clause should be held unenforceable if enforcement would contravene a strong public policy of the forum in which suit is brought, whether declared by statute or by judicial decision." Bremen, 407 U.S. at 15, 92 S.Ct. at 1916 (emphasis added).[3] Also the majority attempts to argue that Scherk can be distinguished because the Court had a competing federal statute, the Arbitration Act, to reconcile with the securities laws. Scherk 's reliance on Bremen did not depend on the Arbitration Act. The Arbitration Act only placed arbitration provisions on equal footing with other contractual clauses, like choice-of-forum clauses. See Scherk, 417 U.S. at 511, 94 S.Ct. at 2453 (noting that the Arbitration Act puts arbitration agreements "upon the same footing as other contracts"); Cange v. Stotler & Co., 826 F.2d 581, 595 (7th Cir.1987) (Easterbrook, J., concurring) ("The Federal Arbitration Act was designed to reverse centuries of judicial hostility to arbitration not to make arbitration agreements more readily enforceable than other agreements." (citations and internal quotations omitted)). It did not make arbitration clauses more binding than choice-of-forum clauses.
 
 
 71
 Further, in cases discussing the extraterritorial effect of the securities laws, courts have been careful to examine the policies of the securities acts before expanding the securities acts and violating notions of international comity. See Leasco Data Processing Equip. Corp. v. Maxwell, 468 F.2d 1326 (2d Cir.1972); Bersch v. Drexel Firestone, Inc., 519 F.2d 974, 985 (2d Cir.), cert. denied, 423 U.S. 1018, 96 S.Ct. 453, 46 L.Ed.2d 389 (1975).[4] Although not done explicitly, the other circuits have determined that if the policies of the securities acts were adequately protected abroad, then the antiwaiver provisions should not operate to invalidate forum selection and choice-of-law clauses and force U.S. laws on parties who have chosen other law. Given the active judicial role in determining the scope of the securities laws in international transactions, I believe we should follow the lead of the other circuits and enforce the clauses if remedies in England are adequate to serve the policies of the securities laws. See Roby, 996 F.2d at 1364. The Names did not expect more when they volunteered to sign the General Undertaking.
 
 B. Public Policy of the Securities Acts
 
 72
 In this case, English law adequately protects the policies embodied in the securities laws. Appellants have alleged violations of sections 12(1) and 12(2) of the 1933 Act, 15 U.S.C. § 771(a), and section 10(b) and rule 10b-5 of the 1934 Act, 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. These sections are aimed "at prospectively protecting American investors from injury by demanding 'full and fair disclosure' from issuers," Roby, 996 F.2d at 1364, deterring fraud and manipulative practices in the securities markets, and compensating defrauded investors. See Randall v. Loftsgaarden, 478 U.S. 647, 664, 106 S.Ct. 3143, 3153-54, 92 L.Ed.2d 525 (1986). While English and American remedies are not identical, "the possibility of an unfavorable change in law" should not be dispositive unless the "remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all." Piper Aircraft Co. v. Reyno, 454 U.S. 235, 254-55, 102 S.Ct. 252, 265, 70 L.Ed.2d 419 (1981).[5] Though a difficult question, English remedies seem to serve these policies adequately.
 
 1. Fraud and Manipulative Practices
 
 73
 English law provides remedies for fraudulent, negligent, and even innocent misrepresentation. Further, section 47 of the English Financial Services Act creates penalties for misleading statements or omissions made knowingly or recklessly. See Bonny, 3 F.3d at 161. "While the ... Names might have been able to sue 'controlling persons' under the United States securities laws and establish liability without proving reliance, it is not unfair for English law to require proof of actual misconduct and reliance." Roby, 996 F.2d at 1365.
 
 
 74
 Although section 14 of the Lloyd's Act of 1982 exempts the Corporation of Lloyd's (and its officers and employees) from liability in damages, Lloyd's is not exempt for acts "done in bad faith." As fraud requires bad faith, even with section 14, Lloyd's remains liable in damages for fraud. Further, section 14 does not preclude the "grant of an injunction, a declaration or restitutionary relief against Lloyd's," and one of the remedies under English law for misrepresentation is rescission. Thus, even for negligent misrepresentation, Appellants may rescind their contract.
 
 
 75
 Finally, section 14 of the Lloyd's Act applies only to the Corporation of Lloyd's and not to Members and Managing Agents. Although these entities are not named in this action, the Lloyd's insurance market cannot function without them and thus suits against Members and Managing Agents will deter fraud by and lead to closer supervision by the entities named in this action.
 
 2. Disclosure
 
 76
 English law provides Lloyd's entities with adequate inducement to disclose material information to American investors because failure to do so gives rise to liability for breach of contract. The Members Agent's Agreement requires each Members' Agent promptly to provide information to Names regarding the Underwriting Syndicates. See Roby, 996 F.2d at 1366. Again, the Members Agents are not named in this suit. But the Lloyd's structure imposes the disclosure duties on the Members Agents and thus adequately assures appropriate disclosure.
 
 3. Compensation
 
 77
 English law allows Appellants to recover damages from Lloyd's for fraud. Further, as an incident of a rescission remedy, Appellants may obtain indemnity against liabilities incurred. Additionally, Names have obtained judgments against Members and Managing Agents in England. See Arbuthnott v. Fagan & Feltrim Underwriting Agencies, Ltd., [1994] 3 Re LR 145; Deeny v. Gooda Walker Ltd., The Times, October 7, 1994 (Q.B. Commercial Ct.); Henderson v. Merrett Syndicates, Ltd., 1992 Folio 1496 (Q.B. Commercial Ct.); Henderson v. Merrett Syndicates, Ltd., [1994] 3 W.L.R. 761 (H.L.). Appellants claim that no Names have successfully enforced these judgments because the Agents are now insolvent. That the parties most easily sued in England are insolvent is indeed unfortunate. The Lloyd's system met with global disaster in the wake of American asbestos litigation. That misfortune, however, does not commend itself as a reason to open up United States courts for the pursuit of solvent defendants in the plaintiff-friendly environment of California.
 
 
 78
 Without question, England imposes additional barriers to recovery and will thus not provide deterrence, disclosure, or compensation equal to that provided by the United States securities laws. However, the English regulatory structure and the remedies available in England are not so inadequate that enforcement of the choice-of-forum clause violates public policy. Cf. Howe v. Goldcorp Invs., Ltd., 946 F.2d 944, 952 (1st Cir.1991) (dismissing a securities case on forum non conveniens grounds even though there may be some differences between Canadian and American securities laws), cert. denied, 502 U.S. 1095, 112 S.Ct. 1172, 117 L.Ed.2d 418 (1992). Though a complex question with respect to the securities laws, English law does adequately protect the interests reflected in the American securities laws for those United States residents who elect to participate in English underwriting agreements.
 
 C. RICO
 
 79
 The majority also remands for a determination whether "the Choice Clauses are reasonable in their impact on the obligations established by RICO." Again, I must respectfully disagree. The record provides sufficient information to determine the adequacy of English remedies for a RICO claim. Although RICO provides treble damages not available in England, the remedies in England are adequate to prevent the fraudulent securities conspiracy alleged here. See supra Part II.B.; cf. Lockman Found. v. Evangelical Alliance Mission, 930 F.2d 764, 768-69 (9th Cir.1991) (holding that RICO claims may be dismissed on forum non conveniens grounds even when they would not be available in the alternative forum). Further, even to suggest that a plaintiff need only plead a cause of action under RICO to invalidate Choice Clauses in freely negotiated contracts defies reason. A party's contractual choices cannot be so easily repudiated by artful pleading.
 
 CONCLUSION
 
 80
 I concur in that part of the majority opinion which affirms the dismissal of the Blue Sky law, common law fraud, and breach of fiduciary claims, and agree with the majority that the clauses were not procured by fraud. However, I would affirm the district court across the board, and therefore I dissent from the reversal and remand.
 
 
 
 [1]
 Appellants argue that their investment in Lloyd's is no different from an investment in any predominantly British company. However, other foreign companies do not have their own elaborate regulatory structure nor do other companies require investors to sign multiple agreements with foreign agents. Further, the Names knew they were subjecting themselves to this uniquely English regulatory structure
 
 
 [2]
 The issue before the Court involves the enforcement of the choice-of-forum clause on a Rule 12(b)(3) motion to transfer venue. The choice-of-law clause is relevant only because the incidental effect of enforcing the forum selection clause would lead an English court interpreting the choice-of-law clause to preclude operation of U.S. statutory law
 
 
 [3]
 Stewart Org., Inc. v. Ricoh, 487 U.S. 22, 28, 108 S.Ct. 2239, 2243, 101 L.Ed.2d 22 (1988), does not compel abandoning Bremen analysis in this situation. There the Court noted that the Bremen case "may prove instructive in resolving the parties' dispute," Stewart, 487 U.S. at 28, 108 S.Ct. at 2243, and unlike 28 U.S.C. § 1404(a) at issue in Stewart, the antiwaiver provisions do not specifically address transfer of venue
 
 
 [4]
 The Leasco line of cases did not address the effect of international choice clauses on the applicability of the securities laws
 
 
 [5]
 Piper is a forum non conveniens case. If the possibility of an unfavorable change in the law does not control where the parties have not affirmatively selected a forum, then it certainly should not control where the parties have made a forum choice